# Illinois Official Reports

## Appellate Court

---

### *People v. Barnes*, 2013 IL App (1st) 112873

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL BARNES, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-2873 |
| Filed | December 18, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for aggravated battery of a child was reversed and the cause was remanded for a new trial on the grounds that the trial court abused its discretion in allowing the child to be presented as an exhibit of the injuries defendant allegedly inflicted in the course of washing the child with scalding water and in admitting evidence of a liver contusion, and at the new trial, the trial court's refusal to admit evidence of the mother's loss of custody of her children and her prostitution arrests as irrelevant would stand to bar that evidence, and the acquittal on the heinous battery charge will prohibit retrial on that charge. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-14026; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal    Michael J. Pelletier, Alan D. Goldberg, and Levi S. Harris, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary P. Needham, and Margaret M. Smith, Assistant State's Attorneys, of counsel), for the People.

Panel    JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Neville and Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1    Following a jury trial, defendant Michael Barnes was convicted of aggravated battery of a child and sentenced to 30 years in prison with a 3-year period of mandatory supervised release. On appeal, Barnes contends that the circuit court erred in (1) barring Barnes from questioning the victim's mother about her children being removed from her custody and her arrests for prostitution, (2) allowing the State to introduce evidence of the victim's liver contusion where the State did not show that the injury resulted from a crime in which Barnes participated, and (3) allowing the State to show the jury the victim's actual injuries to establish the element of permanent disfigurement. For the reasons that follow, we reverse the judgment of the circuit court of Cook County and remand for a new trial.

¶ 2                                  BACKGROUND

¶ 3    In July 2009, Felice Toney lived in a basement apartment at 5204 South Honore Street in Chicago with her two-year-old son, K.T., and Barnes. Toney had not lived in the apartment for very long and did not know Barnes before she moved into the apartment. Toney also had an infant daughter who was living with the baby's father at the time Toney and K.T. were living in the basement apartment on Honore.

¶ 4    The owner of the house on Honore lived on the first floor with his daughter Denise, her boyfriend and their two children, and his daughter Shawanda and her eight children. Shawanda's children were between the ages of 2 and 12, and Denise had a 2-year-old and an infant. Toney knew Denise through mutual friends.

¶ 5    The basement apartment consisted of an open space with a pull-out couch, a second couch, and an area separated by a partial wall with a twin bed. Pit bulls were kept in a fenced-off area of the apartment. There were no kitchen facilities. There was a bathroom with a sink, toilet and shower, but the shower did not work. To bathe K.T., Toney would fill the bathroom sink with soap and water and give K.T. a sponge bath.

¶ 6       On the afternoon of July 19, 2009, Toney watched three movies in the basement apartment with K.T. and two of the young children who lived upstairs. It was hot in the basement, and K.T. was dressed in a diaper and T-shirt. At approximately 9:30 p.m., Toney left the apartment to go out with friends. Barnes agreed to take care of K.T. as long as Toney returned by 9 a.m. the following day so that he could go to work.

¶ 7       When Toney returned to the apartment at approximately 8:30 a.m. on July 20, Barnes and Denise were in the apartment talking. Toney sat on the couch and noticed that K.T. was lying on the pull-out couch in a position with his arms bent at the elbows underneath his torso, his fists up by his shoulders, and his knees drawn up so that his bottom was in the air. K.T. had his face turned toward the wall, apparently sleeping. Denise's boyfriend came into the apartment and the adults talked for five more minutes.

¶ 8       Denise and her boyfriend then left and Toney noticed that K.T. was looking at her and that he was shaking. Barnes picked K.T. up and sat him on Toney's lap. Toney patted K.T.'s bottom and realized he was not wearing a diaper and started unzipping the sleeper he was wearing so she could put a diaper on him.

¶ 9       Toney pulled the sleeper down and saw that K.T.'s skin was shiny and white and that his back appeared to be melted and peeling and was covered in blisters and boils. Toney asked Barnes what happened and Barnes said that he had bathed K.T. and maybe the water was too hot. Toney wrapped K.T. in a blanket, took him outside, and called her grandmother who lived nearby to take them to the hospital.

¶ 10       Toney's grandmother drove them to Provident Hospital, where doctors inserted an IV and transferred K.T. to Stroger Hospital by ambulance. The doctors at Stroger began treating K.T. immediately, cutting off boils and dead skin. The skin on the entire midsection of K.T.'s back, extending down his back and including the skin on his buttocks, was gone. K.T. had boils on his shoulders, his legs were raw, and boils went down to the top of his feet.

¶ 11       Additional tests were ordered, including liver and pancreatic enzyme tests. K.T.'s liver enzymes were extremely high, an indication of a possible internal abdominal injury. A CT scan revealed a contusion or bruise on the left lobe of K.T.'s liver.

¶ 12       Chicago police officers spoke to Toney at the hospital and she told them what Barnes had said about bathing K.T. Later that afternoon, three detectives went to 5204 South Honore to pick Barnes up for questioning. The detectives located Barnes outside the residence and transported him to the police station. The detectives advised Barnes of his *Miranda* rights, and Barnes indicated that he would waive his right to remain silent and would answer their questions.

¶ 13       Barnes told the detectives that he was washing some clothes in a plastic tote at approximately 5:30 a.m. when he smelled something. Barnes noticed that K.T., who was in bed, "was shitty and wet" and the bed was wet. Barnes took K.T. from the bed and took him into the bathroom, where he soaped him up and put him in the plastic container he had been using to wash the clothes. Barnes gave conflicting statements about whether K.T. was seated or standing in the container. Barnes then used a smaller plastic container to pour water over K.T.

to wash the soap off while K.T. was still in the plastic tote. Barnes said that he mixed the hot and cold water and used that water to rinse K.T.

¶ 14    Barnes told the detectives that K.T. cried and struggled to get out of the tote, but that he "was determined to keep him in the tub" in order to rinse the soap off his body. Barnes said that he realized the water he used to pour over K.T. was hot, but he did not know how hot it was. After the bath, which lasted for five minutes or longer, Barnes dressed K.T. in a zip-up sleeper without a diaper.

¶ 15    On August 6, 2009, Barnes was charged by information with one count of attempted first degree murder, three counts of aggravated battery of a child, and three counts of heinous battery. Barnes proceeded to trial on two counts of aggravated battery and one count of heinous battery.

¶ 16    Prior to trial, the State moved to prohibit Barnes from eliciting evidence regarding Toney's two arrests for prostitution or her involvement with the Department of Children and Family Services (DCFS) and the fact that she no longer had custody of her children. The trial court granted the motion to exclude evidence of prostitution, finding that the probative value of Toney's arrests for prostitution was far outweighed by the prejudicial effect of the evidence, where the evidence showed that Toney was not present when K.T. was injured and both arrests occurred after the injury. The trial court also granted the motion to exclude evidence of Toney's involvement with DCFS on hearsay grounds. The trial court clarified that if there was anything in the DCFS records regarding Toney's statements about the incident with K.T. that conflicted with her testimony, the defense could ask her about it.

¶ 17    Barnes moved *in limine* to prohibit the State from presenting evidence of K.T.'s liver contusion and from presenting K.T. in person to the jury to demonstrate the permanent disfigurement element of its case. The trial court found that evidence of the liver contusion was relevant to the issue of whether Barnes intentionally harmed K.T. and ruled that the State could present such evidence. The trial court also found that the probative value of the jury seeing the actual physical results of the scalding in evaluating the issue of permanent disfigurement outweighed any prejudicial effect, and ruled that the State could present K.T. in person and show his injuries to the jury.

¶ 18    At trial, Detective Pamela Laughlin testified that she was one of the detectives who interviewed Barnes on July 20, 2009. Detective Laughlin did not observe any injuries on Barnes's hands. She later returned to the apartment with another detective who measured the temperature of the water in the bathroom sink and determined that it was 126 degrees.

¶ 19    Toney testified that she had lived in the basement apartment for three or four months prior to the incident involving K.T. and that she had not known Barnes when she moved in. She stated that it was just a temporary living situation and that she had previously lived with the father of her infant daughter but moved out because he was abusing her. Toney confirmed that her daughter did not live with her at the residence on Honore. During the time she lived in the basement apartment, Toney had seen Barnes change K.T.'s diaper and wash him in the bathroom with a washcloth while K.T. was standing next to the sink. Toney had never seen Barnes bathe K.T. in a plastic container.

- 4 -

¶ 20    Barnes would watch K.T. three or four times a week while Toney was out of the apartment. Barnes had Toney's cell phone number and, although he did not have his own phone, he would use someone else's phone to call her when she was out if he needed something. On the night of July 19-20, Toney did not receive any calls from Barnes.

¶ 21    After Toney arrived home the morning of July 20 and Denise and her boyfriend left the apartment, Barnes seemed to be agitated and in a rush. When Toney realized K.T. was not asleep as she originally thought when she entered the apartment, she said, "Hey, man, come here." K.T. was shaking and Toney asked what was wrong. Barnes picked K.T. up as if nothing was wrong and put him in Toney's lap.

¶ 22    Barnes told Toney that K.T. was not wearing a diaper because there were only two left, and Toney told him that he should still have put a diaper on and she would get some more. She then asked Barnes why K.T. was wearing a full sleeper with feet and long sleeves when it was so hot in the basement. Toney did not remember whether Barnes responded, because she had started unzipping the sleeper so that she could put a diaper on K.T. and saw that K.T.'s back looked like it was melted and was covered with blisters and boils. Toney said that K.T.'s back and legs looked shiny and white, as if they had been laminated and that the skin was gone on his legs. Toney testified that she could not remember exactly what Barnes said when she asked him what happened, but it was something like, "I don't know. I washed him up. The water might have been too hot."

¶ 23    Toney called her grandmother who lived nearby and her grandmother drove them to the hospital. Toney stayed in the emergency room for about 40 minutes while the doctors cut the boils off K.T.'s body. Toney then left the emergency room to speak to the police officers. She told the officers what Barnes had said about washing K.T.

¶ 24    Toney testified that at the time she left the apartment on July 19, K.T. did not have any burns on his body. She further testified that K.T. did not have any injuries on his body at that time and that she did not see any bruising on his abdomen, sides, or pelvic area. K.T. remained in the hospital for a month. At the time of trial, approximately two years after the incident, K.T. still had to wear a special suit to keep his skin intact and tight while it healed, and had permanent scarring on his body.

¶ 25    Toney identified photographs depicting K.T.'s injuries taken on July 20, 2009, and the photographs were published to the jury. When the State attempted to introduce photographs of K.T. depicting the permanent scars that remained at the time of trial, defense counsel objected on the grounds that if the State planned to use the actual child as an exhibit, the photographs were cumulative. The trial court overruled the objection, stating that the photographs were not cumulative. Toney then identified photographs depicting scarring on K.T's back, buttocks, shoulder and right leg as of the time of trial and the photographs were published to the jury.

¶ 26    The parties stipulated that if called, Chicago police officer K. Fullman would testify that he interviewed Toney on July 20, 2009, at 5204 South Honore, and that Toney told him that Barnes said the water must have been too hot when he gave K.T. a bath. When Toney asked Barnes why he had not said anything to her about it before then, Barnes said that "he washed him up and he is trying."

¶ 27    The parties further stipulated that if called, Detective Randall Riley would testify that he interviewed Toney at Stroger Hospital on July 20, 2009, and that Toney said Barnes told her, "I don't know anything about the burns. I washed the baby up. Maybe the water was too hot. I'm new at this."

¶ 28    Dr. Norell Rosado testified as both K.T.'s consulting physician and as an expert in child abuse pediatrics. When K.T. arrived at Stroger Hospital, one of only two hospitals in the area with burn units, he had multiple burns on the back, buttock, perineal area, and genitals, and on the side and back of one of his legs. The burns covered approximately 20% to 25% of his body surface and were deep, second degree scald burns. K.T. had some burns on his upper back and on one shoulder, but the majority of the burns were on his lower back. K.T. also had numerous blisters on his body; some of them had ruptured and some were still intact.

¶ 29    Additional tests were ordered to determine whether K.T. had any other injuries. Blood was drawn in order to test K.T.'s liver and pancreatic enzymes. Dr. Rosado explained that internal injuries can exist even without any external bruising, and when there is blunt trauma to the internal organs, the enzyme levels will be elevated. One of the two enzymes that were measured for K.T. was in the 2,200 range when it is normally below 50 or 60, and the other was in the 1,200 range when it should normally be below 80. A CT scan of the abdomen revealed that K.T. had a contusion on the left lobe of his liver. Twelve hours later, a second enzyme test showed that both enzymes had decreased significantly, to the 300 and 400 range, respectively.

¶ 30    Dr. Rosado explained that with acute injury to the liver, the enzyme levels rise and go back down relatively quickly, within 24 to 36 hours. He explained that K.T. would have suffered the injury to his liver within 12 hours of the time that his enzyme levels were very high and 24 to 36 hours of the time that his enzyme levels decreased. When asked how a child would get a liver contusion, Dr. Rosado answered that it would be from blunt trauma to the abdomen, which could include a punch or a kick, and that a significant amount of force would be necessary. Dr. Rosado opined that, to a reasonable degree of medical certainty, K.T.'s liver contusion was the result of an inflicted trauma that was caused by child abuse.

¶ 31    Dr. Rosado testified that he did not see any bruising on K.T.'s abdomen. He also acknowledged that a liver contusion could happen in a number of ways and that there were no injuries to any other internal organs.

¶ 32    Dr. Rosado further testified that the burns K.T. suffered were inconsistent with K.T. sitting down and having water poured over him, but were more consistent with someone pouring scalding water directly over his lower back just above the buttocks. If someone was pouring scalding water over a child from the top down, you would expect to see the deepest burns at the point of first contact and then a cascading effect farther down because the water would cool and burn less as it cascaded down. However, there was no cascading effect seen on K.T. In fact, K.T.'s deepest burns were just above his buttock and on the back of his right hip, where the skin was whiter and looked "leathery," indicating a deeper burn than areas that were more red. Moreover, K.T. had a few blisters on his abdomen but no burns on the front of his body, and no injuries to his feet or the bottom half of his legs. The burn injuries on K.T.'s shoulder and upper back area had the same depth across the entire area, and thus were not cascading burns, which get less deep as the water goes down, but could have been caused by rising steam

from the lower point of contact. The burns could also have been consistent with a child flailing his arms and splashing himself with water as he tried to move out of the hot water.

¶ 33 In order to cause second degree burns instantaneously like the burns seen on K.T., Dr. Rosado testified that the water temperature would have had to be 130 degrees and that a temperature of less than 130 degrees would not cause those types of burns instantaneously. He explained that if the temperature was 126 degrees, it would take minutes for the burns to form. Skin that is burned turns red immediately, but it can take hours for blisters to form. Dr. Rosado stated that the burns K.T. suffered were not consistent with a child taking a bath in water that was a little too hot and concluded that K.T.'s burns were not accidental but were an intentional act of child abuse. On cross-examination, he acknowledged that there could be a reasonable explanation for the burns that did not involve abuse. Finally, Dr. Rosado testified that K.T. had permanent scars as a result of the burns.

¶ 34 Outside the presence of the jury, the trial court discussed the issue of whether K.T. could be shown to the jury as an exhibit and observed that because K.T. was only two years old at the time of the incident, he was not a witness to what occurred but he was a witness to what happened to him. The trial court stated that the jury should be allowed to see K.T.'s injuries because the elements of the charges against Barnes included disfigurement and permanent disfigurement. The trial court explained that it was not unduly prejudicial because "if that's what occurred, that's what occurred," and ruled that K.T. would be marked as an exhibit and his injuries would be shown to the jury. The jury was instructed that the next evidence it would be seeing would be K.T. himself. The assistant State's Attorney then pulled K.T.'s pants down, picked him up and showed the jury the scarring on K.T.'s side and legs.

¶ 35 The defense called Dr. Leslie Zun, who was recognized over the State's objection as an expert in the field of child abuse and neglect and emergency medicine. Dr. Zun reviewed hospital records, police reports and DCFS records as well as photographs relating to the burns K.T. sustained. On the basis of the material he reviewed, Dr. Zun could not determine whether K.T.'s burns had been inflicted intentionally or accidentally. Dr. Zun estimated that if a two-year-old child was bathed in water that was 126 degrees, the child would incur second degree burns in about 30 seconds.

¶ 36 Dr. Zun observed a submersion type injury to K.T.'s buttocks area and some splash marks on his hands. Dr. Zun further opined that K.T.'s burns were not caused by steam because the burn pattern was fairly well demarcated and steam burns are usually more diffuse. Because children have more delicate skin than adults do, it would take less time for a child to be burned by hot water than it would for an adult. Moreover, a child's skin could turn red from bath water even if there was no harm to the skin.

¶ 37 Dr. Zun also reviewed the CT scan of K.T.'s liver. Dr. Zun said the injury to K.T.'s liver could not have occurred more than 24 hours prior to the decrease in liver enzyme levels. However, on redirect he was asked if the liver contusion could have happened up to 24 hours prior to the time it was first discovered at approximately 11 a.m. on June 20, 2009, and Dr. Zun answered affirmatively.

¶ 38 The jury found Barnes guilty of aggravated battery of a child and not guilty of heinous battery. Barnes filed a motion for a new trial. At the hearing on the motion, defense counsel

- 7 -

argued that the evidence presented at trial was consistent with the theory that K.T.'s burns were accidental rather than intentional. Defense counsel also argued that it was error to allow K.T. to be seen in front of the jury because it was highly prejudicial and served to inflame the passions of the jurors. In response, the State argued that showing K.T.'s actual scars to the jury was relevant to the charge of heinous battery and was necessary to show the true nature of the scarring because that did not come through in the photographs. The State argued that the passions of the jury could not have been inflamed because the jurors rejected the heinous battery charge.

¶ 39 In ruling on the motion, the trial court noted that the evidence of the liver contusion was admissible circumstantial evidence because the injury could have happened up to 24 hours earlier and K.T. was in the custody of Barnes for at least a portion of that time. The trial court further stated that displaying K.T.'s actual scars to the jury was proper to show the permanent disfigurement element of the heinous battery charge and there was no evidence the jurors were prejudiced by it where the jury found Barnes not guilty of heinous battery. Finally, the trial court found that it was proper to exclude evidence of Toney's arrests for prostitution where there was no suggestion that someone else might have been at the house during the time frame in which K.T. would have sustained the injury to his liver. The evidence regarding the removal of Toney's children from her custody by DCFS was also irrelevant because there was never any suggestion that Toney herself had done anything to K.T. The motion for a new trial was denied and the trial court sentenced Barnes to 30 years in prison with 3 years of mandatory supervised release. Barnes timely filed this appeal.

¶ 40 ANALYSIS

¶ 41 All of the issues raised by Barnes on appeal concern the trial court's rulings on evidentiary issues. The decision whether to admit or exclude evidence is left to the sound discretion of the trial court and will not be reversed absent a clear showing of abuse of that discretion resulting in manifest prejudice to the defendant. *People v. Lucas*, 151 Ill. 2d 461, 489 (1992). An abuse of discretion will only be found where " 'the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *People v. Wheeler*, 226 Ill. 2d 92, 133 (2007) (quoting *People v. Caffey*, 205 Ill. 2d 52, 89 (2001)). Evidence is considered relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action either more or less probable than it would be without the evidence. *People v. Morgan*, 197 Ill. 2d 404, 455-56 (2001). Because all of Barnes's claimed errors involve evidentiary rulings, our standard of review on each issue is whether the trial court abused its discretion.

¶ 42 A. Use of K.T. as an Exhibit

¶ 43 Barnes contends that the trial court abused its discretion in allowing the assistant State's Attorney to pull down four-year-old K.T.'s pants, pick him up, and show his scarred body to the jury. Barnes argues that the prejudicial effect of such evidence outweighed its probative value and that it was cumulative, where the jury had already seen a number of photographs accurately depicting the scarring on K.T.'s body two years after he was burned.

¶ 44 In the context of determining whether the prejudicial effect of the evidence substantially outweighs its probative value, our supreme court has recognized that prejudice means " 'an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt or horror.' " *People v. Eyler*, 133 Ill. 2d 173, 218 (1989) (quoting Michael H. Graham, Cleary and Graham's Handbook of Illinois Evidence § 403.1 (4th ed. 1984)). In determining that the prejudicial effect did not substantially outweigh the probative value of the jury seeing K.T.'s actual scars, the trial court relied on *People v. Fomond*, 273 Ill. App. 3d 1053 (1995), and *People v. Cooper*, 283 Ill. App. 3d 86 (1996).

¶ 45 In *Fomond*, the victim sustained third degree burns on her hands and the defendant was convicted of aggravated battery, aggravated battery of a child and heinous battery. *Fomond*, 273 Ill. App. 3d at 1054. During the trial, the State presented the then-five-year-old victim to the jury so that the jury could observe the burns on her hands. *Id.* at 1056. However, the defendant did not challenge the admission of this evidence on appeal, so *Fomond* does not offer any guidance regarding whether the prejudicial effect of showing a child's actual scars to the jury substantially outweighs any probative value of such evidence. *Cooper* is even less instructive. *Cooper* merely stands for the proposition that photographic evidence of the severity of the burns suffered by the victim and expert witness testimony regarding the permanent scarring as a result of those burns constituted sufficient evidence to support the defendant's heinous battery conviction. *Cooper*, 283 Ill. App. 3d at 92.

¶ 46 Here, where the State established the permanent disfigurement element of the heinous battery charge through photographs and expert testimony, it was an abuse of discretion to allow the State to show K.T.'s actual injuries to the jury. Using a four-year-old child as an exhibit was extremely prejudicial because the risk that it would unduly influence the outcome by inflaming the passions of the jury was high, while the probative value of such evidence was marginal where the State had several other avenues through which to establish the element of permanent disfigurement. The issue of whether this error resulted in manifest prejudice to Barnes is discussed below.

¶ 47                            B. Evidence of Liver Contusion

¶ 48 Barnes next contends that the trial court abused its discretion in allowing the State to introduce evidence of K.T.'s liver contusion as uncharged other-crimes evidence. The State responds that the evidence was admissible to show intent or absence of mistake.

¶ 49 Typically, evidence of other crimes is admissible if relevant for any purpose other than to show a defendant's propensity to commit crimes. *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). Permissible purposes include the showing of intent or the absence of mistake or accident. *Id.* Even then, the evidence should not be admitted if its prejudicial effect substantially outweighs its probative value. *Id.* at 284. The admissibility of other-crimes evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *Id.*

¶ 50 However, before introducing evidence of other crimes, the State must meet the threshold requirement of showing that a crime took place and the defendant either committed it or participated in its commission. *People v. Thingvold*, 145 Ill. 2d 441, 455 (1991). It is not necessary to prove beyond a reasonable doubt that the defendant committed or participated in

the crime, but there must be more than a mere suspicion regarding the defendant's involvement. *Id*.

¶ 51　　We note that a split of authority has recently developed in this court, with one division of this court holding that where the contested evidence is intrinsic to the crime charged, even if there is no evidence that the defendant committed or participated in the commission of the prior crime, the evidence is admissible under general relevancy principles. *People v. Morales*, 2012 IL App (1st) 101911, ¶ 32. Another division of this court disagreed, noting that in the cases relied on by the *Morales* court, there was undisputed evidence that the particular defendants were involved in the prior incidents. *People v. Pikes*, 2012 IL App (1st) 102274, ¶ 41.

¶ 52　　In *People v. Pikes*, 2013 IL 115171, ¶ 16, our supreme court determined that because the evidence was clear that the defendant was not involved in the prior incident, the evidence was not properly characterized as other-crimes evidence. Thus, it was unnecessary for the court to specifically address the issue of whether crimes that are intrinsic or related to the charged offense in some way should be treated differently for purposes of other-crimes analysis. However, the court noted that the other-crimes doctrine is concerned with separate, distinct, and disconnected (extrinsic) crimes and that the other-crimes principles only apply when the defendant is alleged to have committed the prior, separate offense. *Id*. ¶ 20. Thus, the *Pikes* court did not directly address the issue of whether an offense that is intrinsic to the crime charged should be analyzed under ordinary relevancy principles. We believe such an analysis is appropriate here.

¶ 53　　Evidence is generally admissible if it is relevant, that is, if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ill. R. Evid. 401, 402 (eff. Jan. 1, 2011). However, even relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ill. R. Evid. 403 (eff. Jan. 1, 2011). We conclude that under either other-crimes or general relevancy principles, the trial court erred in admitting evidence of the liver contusion.

¶ 54　　Although the State does not address the issue of whether the evidence established more than a mere suspicion that Barnes was responsible for the liver contusion, the State contends that the evidence of the liver contusion was admissible to show intent. The State argues that because Barnes contends that K.T.'s injuries were accidental, evidence relating to the liver contusion, which could only have been the result of blunt trauma involving a significant amount of force, is relevant to show that K.T.'s injuries were caused intentionally. The cases relied on by the State are inapposite. In *People v. Oaks*, 169 Ill. 2d 409, 456-57 (1996), *overruled on other grounds by In re G.O.*, 191 Ill. 2d 37 (2000), our supreme court held it was not an abuse of discretion to admit evidence of previous injuries suffered by the victim while he was in the defendant's care. The court determined that because the defendant was alone with the victim when a prior incident occurred, there was no evidence that the victim suffered a seizure as was initially suspected, and fresh bruises and abrasions were found on the victim after the incident occurred, this established more than a mere suspicion that the defendant had committed a prior act of abuse against the victim. *Id*. at 455-56.

¶ 55    Similarly, in *People v. Burgess*, 176 Ill. 2d 289, 308 (1997), the supreme court concluded that the trial court did not abuse its discretion in admitting evidence of prior acts of abuse committed by the defendant against the victim. In *Burgess*, although the defendant argued that the witnesses did not actually see the abuse take place, one witness observed the defendant take the victim into a room with a dog leash, heard striking noises and the victim's cries, and saw welts on the victim after the incident. *Id.* at 307. Other witnesses did, in fact, observe the defendant spanking the victim, pushing the victim into a corner and kicking the victim. *Id.* at 307-08. Another witness, who lived with the defendant for two months, testified that the defendant would take the victim into another room four or five times a day for spankings and the witness would hear the victim crying. *Id.* at 308.

¶ 56    Here, although the evidence established a time frame during which the liver contusion would have happened, K.T. was not in defendant's sole custody that entire time. Further, although tests performed on the morning of June 20 revealed elevated enzymes, there was no testimony at trial that those levels were at their peak or whether they were decreasing at the time K.T. was tested. Particularly where, as here, there were numerous other members of the household in contact with K.T. within the 24-hour period preceding the testing, including other adults and children as old as 12, the assertion that Barnes was responsible for this injury is based on nothing more than suspicion. Dr. Rosado also testified that such an injury would have required a significant amount of force if it had been the result of blunt force trauma, but he acknowledged that there was no apparent bruising on K.T.'s abdomen to support the theory that he was punched or kicked. There was no evidence to suggest Barnes had abused K.T. prior to the date of the scalding incident. Finally, although Dr. Rosado opined that the liver contusion was the result of child abuse, he conceded that there could be another explanation for the injury. Given all of the foregoing circumstances, we do not believe that admission of evidence relating to the liver contusion was proper.

¶ 57    The probative value of this evidence was, therefore, tenuous and the State did not meet its threshold requirement of showing more than a mere suspicion that Barnes actually caused the liver contusion. Moreover, the prejudicial effect was extremely high because the jury would be more likely to convict Barnes of intentionally scalding K.T. if it believed Barnes was responsible for K.T.'s liver contusion. Thus, whether analyzed under either general relevancy or other-crimes principles, we conclude that admission of evidence of the liver contusion was an abuse of discretion.

¶ 58                                    C. Manifest Prejudice

¶ 59    Although we have held that the trial court abused its discretion in allowing K.T. to be used as an exhibit and in admitting evidence of the liver contusion, these errors are only reversible if they resulted in manifest prejudice to Barnes. See *Lucas*, 151 Ill. 2d at 489. The State argues that the use of K.T. as an exhibit, even if in error, was harmless. We disagree. The stated justification for showing K.T.'s scars was to establish the permanent disfigurement element of the heinous battery charge. But in the context of this case, where Barnes did not dispute the cause, extent or permanency of K.T.'s injuries and the only issue before the jury was Barnes's state of mind, allowing the State to display K.T. to the jury was clearly unnecessary. Moreover,

while the jury acquitted Barnes of the heinous battery charge, Toney's testimony that Barnes had babysat and bathed K.T. on several prior occasions without incident arguably made the issue of Barnes's intent a close one and displaying the four-year-old victim's actual scars, which required pulling his pants down in open court, could have influenced the jury's verdict. Finally, when the error of allowing K.T. to be used as an exhibit is considered together with the error of admitting evidence of the liver contusion, it clearly resulted in manifest prejudice to Barnes. Therefore, we reverse Barnes's conviction and remand for a new trial.

¶ 60                            D. Evidence Related to DCFS and Prostitution Arrests

¶ 61        Because these issues are likely to arise on retrial, we address Barnes's remaining challenges to the trial court's evidentiary rulings. Barnes contends that the trial court erred in barring evidence related to Toney's involvement with DCFS and her arrests for prostitution. Regarding DCFS, Barnes specifically argues that he should have been allowed to question Toney about the fact that DCFS had removed both of her children from her custody. Barnes further argues that he should have been allowed to present evidence that Toney had been arrested twice for prostitution and was still actively soliciting prostitution clients online.

¶ 62        Barnes contends that this testimony was relevant to demonstrate interest, bias or motive on the part of Toney. Barnes advances a number of theories in this regard. First, Barnes argues that evidence of Toney's prostitution activity would demonstrate an interest in deflecting suspicion away from herself for any involvement in K.T.'s injuries. Next, Barnes contends that this evidence demonstrates a motive for Toney to testify in the way she perceived the State wanted her to in order to "avoid further recriminations for her active prostitution cases" and "encourage the State and the police to turn a blind eye to her ongoing prostitution enterprise." Barnes further claims that the DCFS evidence would demonstrate that Toney had a motive to testify falsely in order to blame the abuse and neglect of her children on Barnes in hopes of regaining custody of them. Finally, Barnes suggests that because the evidence related to the liver contusion indicated that it could have happened during the time Toney was with K.T., it was critical to allow the contested evidence in because it would have cast doubt on Toney's credibility.

¶ 63        A criminal defendant has a constitutional right to confront the witnesses against him. See U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Crawford v. Washington*, 541 U.S. 36, 54 (2004). The right to confront witnesses includes the right to cross-examine a witness for purposes of showing interest, bias, or motive to testify falsely. *People v. Sims*, 192 Ill. 2d 592, 624-25 (2000). While a defendant should be afforded wide latitude in attempting to establish a witness's bias or motive, the scope of cross-examination remains within the trial court's discretion. *People v. Robinson*, 349 Ill. App. 3d 622, 632-33 (2004). Evidence used to impeach a witness "must give rise to the inference that the witness has something to gain or lose by his testimony" and, thus, should be timely, unequivocal and directly related and may not be remote or uncertain. (Internal quotation marks omitted.) *Sims*, 192 Ill. 2d at 625 (quoting *People v. Triplett*, 108 Ill. 2d 463, 475-76 (1985)).

¶ 64        As the State points out, Barnes's argument that Toney had an interest in deflecting suspicion away from herself for K.T.'s injuries in general fails because the evidence showed

that Toney was not present when K.T. was burned, so there would be no need to deflect suspicion away from herself for those injuries. Also, Barnes readily admitted to police that he had bathed K.T. while Toney was out of the apartment. The only possible argument that could be made under this theory in relation to K.T.'s injuries is that Toney wanted to deflect suspicion away from herself for the liver contusion. However, given our conclusion that evidence of K.T.'s liver contusion was improperly admitted, this argument is now moot.

¶ 65 In addition, evidence that Toney was arrested for prostitution twice after K.T. was injured and continued to solicit prostitution clients at the time of trial is not probative of any issue, and the theory that her alleged illegal activity provided a motive for her to testify falsely so that the police would turn a blind eye is remote and speculative. A trial court may reject evidence on relevancy grounds if it is remote, uncertain or speculative. *Morgan*, 197 Ill. 2d at 456. We further note that the trial court only barred evidence that DCFS had removed Toney's children from her custody, but stated that if there was anything in the DCFS records regarding Toney's statements about the incident with K.T. that conflicted with her testimony and thus went to her credibility, the defense could ask her about it.

¶ 66 The only possible relevance the removal of Toney's children could have is to support Barnes's theory that Toney had a motive to testify falsely in the hopes of regaining custody of her children. Again, this argument is speculative and there is nothing in the mere fact that Toney's children were removed by DCFS to suggest that Toney could hope to regain custody if Barnes was convicted. It is undisputed that Toney was not home at the time of the burn injuries, and there is also no question that Barnes was responsible for those injuries. Barnes does not suggest that DCFS took custody of Toney's children based on a belief that Toney was involved in K.T.'s injuries. Therefore, it is not clear how Toney's testimony regarding Barnes's words and actions when she returned home, which was relevant only to the issue of whether the burning was intentional or accidental, even if false, could have helped her to regain custody of her children. Barnes's arguments on this issue are founded only upon speculation. Thus, we conclude that the trial court did not err in barring evidence of either Toney's arrests for prostitution or the fact that she no longer had custody of her children.

¶ 67 Because the jury acquitted Barnes of the heinous battery charge, double jeopardy concerns prohibit retrial on that charge. See *People v. Placek*, 184 Ill. 2d 370, 376 (1998) (noting that the double jeopardy clause prohibits a second prosecution for the same offense after acquittal). Although Barnes has not claimed that the evidence presented at his first trial was insufficient for conviction, we conclude after a thorough review of the record that the evidence was sufficient to prove Barnes guilty of aggravated battery beyond a reasonable doubt, and thus, there is no double jeopardy impediment to a new trial on the aggravated battery counts. See *People v. Walker*, 232 Ill. 2d 113, 131 (2009) (addressing issue of double jeopardy although defendant did not challenge the sufficiency of the evidence). However, Barnes is entitled to a new trial free of the errors we have identified.

¶ 68 For the reasons stated herein, we reverse Barnes's conviction and remand for a new trial.

¶ 69 Reversed and remanded.