NOTICE

Decision filed 06/06/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 190219-U

NO. 5-19-0219

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 17-CF-289 |
| | ) | |
| RAHSAAN D. GRAHAM JR., | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not abuse its discretion in admitting other crimes evidence where its probative value outweighed its prejudicial effect; no abuse of discretion in denying defendant's motion to continue where there was no prejudice to defendant; evidence supported finding of severe bodily injury; no ineffective assistance found where defendant did not rebut presumption that defense counsel engaged in trial strategy.

¶ 2    The defendant, Rahsaan D. Graham, was charged by information with aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2016)) and unlawful use of weapons by a felon (*id.* § 24-1.1(a)). Following a jury trial, the defendant was found guilty and subsequently sentenced to a term of imprisonment of 13 years with a period of 2 years of mandatory supervised release for count I, and a term of imprisonment of 5 years for count II, to be served consecutively to count I, with a period of 1-year mandatory supervised release. Trial counsel for the defendant

1

filed a motion for a new trial, which was denied. The defendant obtained new posttrial counsel who filed an amended motion for a new trial and a motion to reconsider the sentence, both of which were denied. The defendant appeals from the judgment and sentence imposed. For the following reasons, we affirm.

¶ 3                                    I. Background

¶ 4      The defendant's jury trial was scheduled to begin on November 6, 2017. On November 2, 2017, the trial court granted the State's motion to continue due to late discovery being provided by the Carbondale Police Department. On March 5, 2018, the State filed a second motion to continue the jury trial because they were still attempting to locate a witness. That motion was granted over the defendant's objection.

¶ 5      On June 19, 2018, two days before the scheduled jury trial, the State filed a motion *in limine* wherein it sought to introduce evidence of other crimes or bad acts committed by the defendant directed at Victoria Wilson, who was the State's main witness. In this motion, the State maintained that the other crimes or bad acts included attempts by the defendant to intimidate and influence witness Wilson during the weeks leading up to trial on five different occasions, between May 28, 2018, and June 17, 2018. Specifically, the State sought to admit the following testimony from Wilson: that on May 28, 2018, while the defendant was a passenger in a car that drove by her, she observed the defendant "clack" two guns together while looking at her through his open car window; that on the morning of June 16, 2018, the defendant contacted her through a fake Facebook account offering to pay her $5000 not to testify against him; that on the night of June 16, 2018, she observed on multiple occasions the defendant, a passenger in a car, form a gun with his hands while driving by in a silver Mustang and looking at her as she stood outside of a bar; and that on the same night, as she was backing out of her parking spot attempting to leave a bar, the

2

defendant fired a weapon in her direction. In its motion, the State asserted that the evidence of other crimes or bad acts was not being sought to establish the defendant's propensity to commit crime but rather to establish a continuing narrative of the offenses charged and the defendant's consciousness of guilt. The State further asserted that the probative value of the evidence far outweighed any prejudice.

¶ 6    At the pretrial hearing on June 20, 2018, the State acknowledged that the events that formed the basis of the motion *in limine* had resulted in another pending case against the defendant and were "a developing set of circumstances and a developing situation" that occurred just days before the trial was to start. The State committed to continue to update the defendant if new evidence were to come to light.

¶ 7    The defendant objected to the motion *in limine*, arguing in general that the new evidence was unfairly prejudicial in relation to any probative value it may have. The defendant specifically objected to the first allegation in the State's motion *in limine* which was based on a threatening gesture made by the defendant on May 28, 2018, almost a month prior to trial, but which had not been disclosed to the defendant until one day prior to trial.

¶ 8    Acknowledging that the circumstances of the other crimes and bad acts evidence was a developing situation, the trial court granted the State's motion and allowed the evidence to be presented at trial over the continuing objection of the defendant. The trial court found that the danger of unfair prejudice did not outweigh the probative value of the evidence and stated that a limiting jury instruction would be given as required.

¶ 9    The trial court next addressed the defendant's motion to continue the jury trial which had been filed on June 20, 2018. In support of the defendant's motion, defense counsel asserted that since the State had filed the motion to admit other crimes and bad acts the previous day, she needed

3

additional time to determine if there were witnesses that could possibly discount the evidence that the State was asking to admit at trial the following day. Defense counsel reasoned that since the defendant was in custody on a different case, a speedy trial demand had not been filed so there would be no problem continuing the trial to a later date.

¶ 10 In response, the State acknowledged that most of the defendant's acts outlined in the motion *in limine* had occurred the day before the defendant was due in court for his trial and that they were "serious in nature." The State reported that there was an ongoing investigation into the matter. The State argued that most of the witnesses involved in the most recent events for which the State was seeking to admit the prior bad acts/crimes were also witnesses in the case that was set for trial. Although the State acknowledged that the other crimes or bad acts evidence contained in their motion were still part of an ongoing investigation, it argued that the defendant's own actions the day before trial should not cause a delay in the trial. After hearing the arguments, the trial court stated that it had "considered the situation, the circumstances of everything," and denied the defendant's motion to continue. The jury trial started the following day.

¶ 11 At trial, Tinece Rattler testified that on June 10, 2017, at around 11 a.m. she was with her brother, Montavious Burton, and her cousin, Victoria Wilson. The three of them drove to a gas station in Wilson's car to get some snacks. Wilson was driving, Burton was sitting in the passenger seat, and Rattler was in the back seat. After arriving at the gas station, Burton saw the defendant, and they began to argue. Rattler did not know what they argued about. At some point the argument died down, and Rattler, Burton, and Wilson left the gas station to go back to Rattler's grandmother's house. The defendant left the gas station in a red car at about the same time.

¶ 12    After leaving the gas station, Rattler noticed that they were being followed by the defendant and two other individuals, Jody Pullen and "Waco." Rattler testified that at some point the red car passed Wilson's car and pulled into the driveway of a blue house.

¶ 13    As Wilson, Burton, and Rattler were approaching the blue house, there were two other people outside in back of the house near some trees. The red car's passenger door was open. Rattler saw that the defendant was standing in the passenger door of the car, leaning across the hood. Pullen was getting out of the car on the driver's side. Rattler heard a horn honk and saw people shooting. Although she did not know how many people were shooting, Rattler saw the defendant and Pullen shooting at Wilson's car.

¶ 14    When the shooting started, Rattler ducked down in the back seat and could no longer see outside. The first bullet came through the back passenger's window and glass shattered everywhere, some of it hitting Rattler on the side of her face. Rattler recalled hearing approximately eight shots. Wilson drove to the hospital because Burton had been shot. Rattler saw blood on Burton's forehead and a hole in his wrist with blood dripping down. Wilson was having trouble driving the car because the tire was flat. Rattler jumped out of the car after they dropped Burton off at the emergency room.

¶ 15    Wilson testified on the second day of trial that she had moved to Carbondale to attend college because she had some family who lived there. On June 10, 2017, at approximately 11 a.m. Wilson, Burton, and Rattler went to a convenience store. When they arrived, Wilson saw the defendant enter the store. Wilson later learned that an incident had occurred between Burton and the defendant the evening before Wilson arrived in Carbondale. Burton and the defendant got into a verbal altercation at the store.

¶ 16     After the conversation simmered down, the parties got into their separate cars and "pulled off and everybody left." The defendant was in the passenger seat in the car that Pullen was driving. After leaving the convenience store parking lot, Wilson noticed Pullen's car very close behind her car. At some point, Pullen's car speeded past Wilson's car and pulled into the driveway of a blue house. As they were approaching the blue house, Wilson heard the horn from Pullen's car and saw some people come out of the house. Wilson testified that she saw the defendant shooting at her car, but she could not say for sure that Pullen was also shooting at them. After they drove away, Wilson took Burton to the hospital and called the police. She later identified the defendant as the shooter from a police photo lineup.

¶ 17     On cross-examination, when asked how she knew the defendant, Wilson testified that she knew him from "around town." Wilson testified that after she left the convenience store, the red car in which the defendant was a passenger passed her car and pulled into the driveway of the blue house. She testified that after she heard the shot, she heard the glass from the back window shatter and turned around to check on her cousin as she was speeding away.

¶ 18     Prior to Wilson's testimony of the other bad acts evidence that occurred in May and June 2018, the trial court gave the Illinois Pattern Jury Instructions (IPI), Criminal, No. 3.14 modified instruction to the jury over the continuing objection of defense counsel. The trial court informed the jury that it was up to them to determine whether the defendant was involved in the offenses testified to by Wilson, and if so, what weight to give to the evidence on the issues of identification, intent, motive, consciousness of guilt, and continuing narrative of events.

¶ 19     Wilson testified that at approximately 3:30 p.m. on May 28, 2018, she was at her cousin's house when she saw the defendant's car approach. The defendant was a passenger in his car with

6

two other people when he proceeded to "clack" two guns together as they drove by Wilson with his window down. Wilson took the defendant's actions as a threat and made a report to the police.

¶ 20    On June 16, 2018, at approximately 9:53 a.m., Wilson was contacted through Facebook Messenger from a new account by a person named "Sarah McIntosh." The message read, "Want to make 5K? Stay put is all you have to do." Wilson did not recognize this person's name, and when she searched for "Sarah McIntosh" online, she could not find anything about her. Wilson believed it was the defendant who had sent her the message. When Wilson asked "Sarah McIntosh" what was meant by the statement, the response read, "The situation you know about on the east side. I need you to not know about it no more. It's 5K for you to forget and take vacation until July." On cross-examination, Wilson conceded that she did not know but rather suspected that it was the defendant who was sending her the messages.

¶ 21    On the evening of June 16, 2018, Wilson went to a local bar with her cousin and her aunt. While standing in a crowd outside of the bar, she noticed the defendant in the passenger seat of a silver Mustang as it was driving by. The silver Mustang drove past Wilson multiple times. At one point the silver Mustang stopped in front of the crowd where Wilson was standing. Wilson testified, "When I noticed that [the defendant] seen me in the crowd, I backed up, you know, out of his vision. And he proceeded to ride past me again. So I know he still seen me out there." Wilson saw the defendant make the form of a gun with his hands "countless times" while he was looking at her, and she took the defendant's actions as a threat.

¶ 22    Wilson, her cousin, and her aunt left the bar early in her aunt's car after seeing the defendant. Wilson decided to drive past the bar one more time when she saw the defendant and his friends standing in the middle of the alley. As she was driving past them, the defendant's friend

7

Jermaine flashed Wilson his gun and she felt threatened. The silver Mustang the defendant had been in earlier was backed into a parking spot in the Amtrak parking lot.

¶ 23    As Wilson was attempting to leave, she heard shots being fired. Wilson testified that she had no doubt in her mind that the defendant was the one shooting. She stated that she had a clear view of him and that the defendant was shooting towards her car. After pulling out of the Amtrak parking lot, Wilson saw the silver Mustang pulling up on the right side of her car. She saw the defendant, Nardo, and possibly Jermaine in the car. Wilson heard gunshots start again and started driving fast. As she was fleeing, she was involved in a traffic accident as she ran through a red light and was struck by another vehicle. Wilson saw the silver Mustang turn right at the intersection. Wilson was interviewed by the police about the events that occurred that night at the bar.

¶ 24    Officer Timothy Lomax testified at trial that on June 10, 2017, at approximately 11 to 11:15 a.m., several officers were dispatched to the house where shots had been fired into a vehicle. Officer Lomax observed broken glass and possibly bullet fragments in the roadway, approximately 35 to 40 yards west of the driveway. Officer Lomax described the driveway as not very deep and approximately two car lengths wide. He located five .40-caliber and one 9-millimeter shell casings in the gravel driveway. Officer Lomax testified that police also searched the entire roadway and intersection for evidence.

¶ 25    When Officer Lomax later examined Wilson's vehicle at the police department, he observed bullet strikes on the rear passenger's side, along the rear tire well, and the trunk as well as a bullet strike along the pillar between the front and back seat. The officer noted that the rear passenger's side window had been broken out. He also observed a bullet strike on the front of the vehicle.

¶ 26    At the request of defense counsel, the trial court read the limiting instruction to the jury prior to Officer Zach Whitecotton's testimony regarding the prior bad acts or other crimes evidence. Officer Whitecotton testified that on Sunday, June 17, 2018, he was on duty, monitoring the crowds behind the bars after closing. At approximately 2:17 a.m., Officer Whitecotton was responding to reports of an altercation in the area when he heard four gunshots coming from the area of the Amtrak station. When the officer responded to that area, he saw a large group of people scattering, and he tried to ascertain where the gunshots were coming from. The officer determined that the gunshots seemed to be coming from the area where a silver Mustang was backed into a parking stall at the Amtrak station. As the officers enclosed the area, Officer Whitecotton observed a male who was running display a handgun and fire two rounds directly to the east, which was the area where the silver Mustang was backed in. As the officer was taking the shooter into custody, he observed the silver Mustang leave the parking area very quickly and proceed north toward the Amtrak lot. The officer was unable to identify the individuals in the Mustang. As the silver Mustang exited the parking lot, the officer heard a second gunshot coming from the direction the Mustang had traveled.

¶ 27    At trial the defendant testified that when they left the convenience store, a silver car followed them to the house. The silver car pulled up by the curve. There were two or three other people outside in the yard when he pulled up. When they pulled into the driveway, someone was coming out of the house. By the time the defendant got out of Pullen's car, he heard a shot go off and he ducked. After he heard a couple more shots go off, they got back into Pullen's car and left. The defendant denied creating the Facebook profile for Sarah McIntosh and denied offering Wilson money not to testify. At the close of the evidence, the jury returned guilty verdicts on both charges.

¶ 28    Following his conviction, the defendant obtained new posttrial counsel who filed an amended motion for a new trial and for judgment of acquittal notwithstanding the verdict along with a motion to reconsider the sentence. At the hearing, the defendant argued that consecutive sentences were improper because the State failed to prove that Burton suffered severe bodily injury where the only evidence produced was two photographs of Burton's injuries and testimony from Wilson and Rattler. In support of his argument, the defendant noted that neither Burton nor any medical provider testified, so there was no evidence of the extent, nature, or effect of the injuries to support a finding of severe bodily injury. Additionally, the defendant contended that although Burton's sister gave a brief description of his injuries in her testimony, she did not provide sufficient detail other than to state that the injuries were not present before "the incident" and that she observed blood dripping.

¶ 29    The State countered that mandatory consecutive sentences should be imposed pursuant to section 5-8-4(d)(1) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(1) (West 2016)), because the defendant committed "severe bodily harm" against Burton as seen in the two photographs, People's Exhibits 30 and 31. Although Burton did not testify, Exhibit 30 showed blood dripping from Burton's forehead, while Exhibit 31 showed a bloody hole in his wrist.

¶ 30    After hearing arguments, the trial court found that consecutive sentences were mandatory pursuant to the statute. The trial court based its findings on the fact that Burton was transported directly to the hospital for treatment following the shooting and on the photographic evidence of Burton's wounds as seen in People's Exhibits 30 and 31. In pronouncing sentence, the trial court stated that it found "great bodily harm" had been caused to Burton. The State asked the trial court if "severe bodily harm" was being found rather than "great bodily harm." The trial court responded that he "may have misspoke[n] and used the incorrect language" and then clarified that "it was

10

sufficient to trigger mandatory consecutive sentencing in this situation." The defendant's motion to reconsider the sentence was denied. The defendant filed a timely notice of appeal.

¶ 31                                    II. Analysis

¶ 32                            A. Other Crimes Evidence

¶ 33    The defendant's first claim of error is that the trial court abused its discretion and denied him a fair trial when it granted the State's motion *in limine* to admit other crimes or bad acts where the probative value of the evidence was outweighed the prejudicial effect. The defendant also contends that the State failed to sustain its burden to adequately associate the defendant with the other bad acts or crimes alleged in the motion *in limine* where the only evidence was the unreliable witness testimony from Victoria Wilson.

¶ 34    "The term 'other-crimes evidence' encompasses misconduct or criminal acts that occurred either before or after the allegedly criminal conduct for which the defendant is standing trial." *People v. Spyres*, 359 Ill. App. 3d 1108, 1112 (2005). A trial court's ruling on the admissibility of other crimes evidence is reviewed for an abuse of discretion. *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). The decision on whether to admit or exclude evidence must be made by the trial court responsible for evaluating the probative value of the evidence on a case-by-case basis, and a reviewing court may not substitute its judgment for that of the trial court on matters within the trial court's discretion. *People v. Illgen*, 145 Ill. 2d 353, 370-71 (1991).

¶ 35    Generally, evidence of other crimes is not admissible to prove a defendant's propensity to commit a crime. Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v. Lindgren*, 79 Ill. 2d 129, 137 (1980). Other crimes evidence is admissible if it is relevant to show intent, knowledge, identity, motive, absence of mistake, or *modus operandi*; or "if relevant to establish any material question other than the propensity to commit a crime." Ill. R. Evid. 404(b) (eff. Jan. 1, 2011); *People v.*

11

*Thingvold*, 145 Ill. 2d 441, 452 (1991). However, even where evidence of other crimes is admissible for a permissible purpose, the evidence should be excluded "where the probative value of that evidence is substantially outweighed by the prejudicial effect on defendant's right to a fair trial." *People v. Robinson*, 167 Ill. 2d 53, 62-63 (1995).

¶ 36    Here, the other crimes evidence was testimony from Wilson that on five different occasions prior to trial, the defendant attempted to bribe and intimidate her into not testifying against him. The defendant's argument on appeal is not that the other crimes evidence was not probative, but rather that its probative value was outweighed by its prejudicial effect. We disagree. While Wilson's testimony was prejudicial, the probative value outweighed its prejudicial effect and, therefore, was admissible to prove the defendant's consciousness of guilt as to the earlier shooting incident for which he was being tried. Evidence of an attempt to bribe a witness allows an inference of guilty knowledge. *People v. Perry*, 21 Ill. App. 3d 18, 23 (1974). "Any attempted intimidation of a witness in a criminal case is properly attributable to a consciousness of guilt and is thus relevant." *People v. Jones*, 82 Ill. App. 3d 386, 393 (1980).

¶ 37    The defendant next maintains that the State did not sustain its burden to adequately associate the defendant with the other bad acts or crimes alleged in the motion *in limine* where the only evidence was "unreliable witness testimony" from Victoria Wilson. "[B]efore introducing evidence of other crimes, the State must meet the threshold requirement of showing that a crime took place and the defendant either committed it or participated in its commission." *People v. Barnes*, 2013 IL App (1st) 112873, ¶ 50. While it is not necessary to prove beyond a reasonable doubt that the defendant committed or participated in the crime, there must be more than a mere suspicion regarding the defendant's involvement. *Id*.

¶ 38    Here, the jury heard testimony from Wilson that she knew the defendant from "around town" and identified him from a police photo lineup. Additionally, she testified regarding the defendant's actions in the weeks leading up to the trial, which testimony was offered as support for other crimes evidence. The jury also heard the defendant deny offering Wilson money not to testify. "The jury, as the triers of fact, have the responsibility to determine which of the conflicting testimony of the witnesses is to be believed." *People v. Oestringer*, 24 Ill. App. 3d 185, 187 (1974).

¶ 39    Moreover, the jury was instructed by the trial court that it was up to them to determine whether the defendant was involved in the acts testified to by Wilson, and if so, what weight to give to the evidence on the issues of identification, intent, motive, consciousness of guilt, and continuing narrative of events. "When the trial court admits other-crimes evidence for a non-propensity purpose, it should instruct the jury to consider the evidence *only* for that purpose." (Emphasis in original.) *People v. Potts*, 2021 IL App (1st) 161219, ¶ 175. The appropriate limiting instruction, which was given by the trial court at the end of the trial, is set forth in Illinois Pattern Jury Instructions, Criminal, No. 3.14. *Id.* ¶¶ 175-76. The limiting instruction given by the trial court substantially reduced the prejudicial impact, if any, which may have resulted by virtue of the admittance of such evidence. "A jury is presumed to follow a trial court's jury instructions." *People v. Tapley*, 2020 IL App (2d) 190137, ¶ 81. Accordingly, we find that the trial court did not abuse its discretion in allowing the other crimes evidence to be admitted.

¶ 40                                    B. Motion to Continue

¶ 41    The defendant next argues that the trial court abused its discretion when it denied the defendant's motion to continue the jury trial after granting the State's motion *in limine*, which prevented him sufficient time to investigate and respond to the alleged other crimes evidence.

13

¶ 42    There is no absolute right to a continuance. *People v. Davenport*, 133 Ill. App. 3d 553, 556 (1985). "[T]he granting or denial of a continuance is a matter resting in the sound discretion of the trial court, and a reviewing court will not interfere with that decision unless there has been a clear abuse of that discretion." *People v. Chapman*, 194 Ill. 2d 186, 241 (2000). "A conviction will not be reversed by a reviewing court because of the denial of a continuance, unless the denial resulted in prejudice to the defendant." *People v. Johnson*, 220 Ill. App. 3d 550, 559 (1991). The burden to establish prejudice is on the defendant. *Id*.

¶ 43    In support of his argument on appeal, the defendant relies on *People v. Walker*, 232 Ill. 2d 113 (2009). In *Walker*, defense counsel, admitting she was unprepared to try the defendant's double-murder case because she had inadvertently miscalendared the defendant's trial date, requested a continuance to allow her time to prepare for trial. *Id*. at 126. In response to her request for a continuance, the trial court, without further discussion, ruled: " '[T]his has been set. I am sorry. We will pass this case for trial [today].' " *Id*. at 126-27. When defense counsel once again stated that she was not ready for trial, the trial court informed her that it was " 'irrelevant' " and allowed no further explanation. *Id*. at 127. The trial court later remarked to defense counsel that her request for a continuance was " 'a dirty shame' " and suggested that it was merely a delay tactic. *Id*. at 128. On appeal, the *Walker* court delineated factors that a trial court may consider in determining whether to grant a motion to continue filed by a defendant in a criminal case, and then held that the trial court had abused its discretion in denying the defendant's motion to continue the trial where the record was "devoid of evidence showing that the circuit court considered any of the relevant factors in denying the continuance." *Id*. at 126.

¶ 44    Contrary to the defendant's argument, there is no mandate that a trial court *must* consider the factors listed in *Walker* in determining whether to grant or deny a motion to continue. Indeed,

14

there is no mechanical test to determine the point at which the denial of a defendant's motion to continue in the interest of advancing the judicial proceedings violates the defendant's substantive right to properly defend himself. *People v. Lott*, 66 Ill. 2d 290, 297 (1977). "The circumstances of each case must be weighed, particularly the reasons presented to the trial judge at the time the request is denied." *Id*.

¶ 45     Here, there is nothing in the record to suggest that defense counsel was not prepared for trial. Rather, the defendant requested additional time to investigate and respond to the allegations in the State's motion *in limine*. We cannot say under these circumstances that the trial court abused its discretion in denying the defendant's motion to continue the jury trial. Trial courts are cautioned not to allow the admittance of other crimes evidence to lead to a mini-trial on the collateral offense. *People v. Nunley*, 271 Ill. App. 3d 427, 432 (1995) (courts should carefully limit details to what is necessary to illuminate issue for which other crime was introduced).

¶ 46     Moreover, Wilson was the only witness to provide other crimes evidence in the form of her testimony.[1] Defense counsel had the opportunity to cross-examine Wilson and, in fact, was successful in getting Wilson to concede that, contrary to her trial testimony, she did not actually know whether it was the defendant who was sending her messages over social media. Additionally, the defendant rebutted Wilson's testimony regarding at least some portions of the other crimes evidence. We find that the defendant has failed to establish prejudice that resulted due to the trial court's denial of his motion to continue.

---

[1]Although Officer Whitecotton testified regarding a separate shooting that occurred on Sunday, June 17, 2018, at no time did he provide evidence of other crimes committed by the defendant.

¶ 47                           C. Consecutive Sentences

¶ 48     Next, the defendant argues that consecutive sentences were improperly imposed as the evidence did not support a finding of severe bodily injury. The defendant further argues that the trial court confused "great bodily injury" with "severe bodily injury" and failed to make a specific finding of severe bodily injury. We disagree.

¶ 49     Where a defendant has been convicted of a Class X felony and has been found to have inflicted "severe bodily injury" during the commission of that felony, consecutive sentencing is mandated. 730 ILCS 5/5-8-4(d)(1) (West 2016). The determination by a trial court that a particular injury is "severe" for purposes of consecutive sentencing is a question of fact and may be reversed only if it is against the manifest weight of the evidence. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). Under the manifest weight standard, deference is given to the trial court as the finder of fact because the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses. *Id.* "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or if the finding is unreasonable, arbitrary, or not based on the evidence presented." *Id.*

¶ 50     The defendant correctly notes that not all gunshot wounds rise to the level of severe bodily injury: a "nick or cut" on the arm, caused by a gunshot, which required no medical attention (*People v. Durham*, 312 Ill. App. 3d 413 (2000)); a "grazed" right cheek, caused by a gunshot, which did not require medical treatment beyond the application of a Band-Aid (*People v. Jones*, 323 Ill. App. 3d 451 (2001)); a fractured big toe, caused by a gunshot, when the victim was released after 2½ hours of treatment (*People v. Murray*, 312 Ill. App. 3d 685 (2000)).

16

¶ 51    Here, there is sufficient evidence in the record to support the trial court's finding of "severe bodily injury." Photographic evidence graphically displayed a bullet hole in the victim's wrist which was obviously more "serious" than a nick, cut, graze to the skin, or a broken toe. With respect to People's Exhibits 30 and 31, a picture is truly worth a thousand words. Although the defendant contends there was no testimony or medical records regarding the victim's wounds and subsequent treatment, he fails to cite any authority to support the proposition that such evidence is required before the trial court can make a finding of "severe bodily injury." Based upon the totality of the record, we cannot say that an opposite conclusion was clearly evident or that the trial court's finding was unreasonable, arbitrary, or not based on the evidence presented.

¶ 52    Additionally, the defendant argues that the consecutive sentences were also improper because the trial court confused "great bodily harm" with "severe bodily injury." The defendant correctly notes that the trial court must make a specific finding of severe bodily injury to support a consecutive sentence. Here, the trial court acknowledged that it initially misspoke when it stated that "great bodily harm" had been found. The trial court then clarified that the harm found was "sufficient to trigger mandatory consecutive sentencing in this situation." Accordingly, we find that the trial court did, in fact, make a specific finding of severe bodily injury.

¶ 53                        D. Ineffective Assistance of Counsel

¶ 54    Finally, the defendant argues that he was denied effective assistance of counsel when counsel failed to call Montavious Burton as a witness and failed to impeach the testimony of witness Victoria Wilson.

¶ 55    A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984); *People v. Veach*, 2017 IL 120649, ¶ 29. To prevail on a claim of ineffective assistance of counsel, "a defendant must show that

17

counsel's performance was (1) deficient and (2) prejudicial." *People v. Westfall*, 2018 IL App (4th) 150997, ¶ 61. "Failure to satisfy either prong negates a claim of ineffective assistance of counsel." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 88. "[T]o establish deficient performance, the defendant must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." (Internal quotation marks omitted.) *People v. Manning*, 241 Ill. 2d 319, 327 (2011). "Generally, the decision whether or not to cross-examine or impeach a witness is a matter of trial strategy which will not support a claim of ineffective assistance of counsel." *People v. Pecoraro*, 175 Ill. 2d 294, 326 (1997). "Defendant can only prevail on an ineffectiveness claim by showing that counsel's approach to cross-examination was objectively unreasonable." *Id.* at 327. "[N]either mistakes in strategy nor the fact that another attorney with the benefit of hindsight would have handled the case differently indicates the trial lawyer was incompetent." *People v. Vera*, 277 Ill. App. 3d 130, 138 (1995).

¶ 56    With respect to the defendant's claim that trial counsel was ineffective for failure to call Montavious Burton as a witness, the defendant failed to develop an argument on this point and has therefore forfeited this argument under Illinois Supreme Court Rule 341(h)(7), (i) (eff. Nov. 1, 2017) ("Points not argued are forfeited ***.").

¶ 57    The defendant's next assertion of ineffectiveness is that trial counsel did not impeach the testimony of Wilson either with her alleged inconsistent statements made to an investigating officer, or by use of surveillance video from a neighboring business that would have shown the defendant's vehicle leaving the convenience store parking lot first, contrary to Wilson's testimony of being chased from the parking lot. The defendant submits that had trial counsel used the surveillance video to show that Wilson's testimony was not credible, there is a reasonable probability that the outcome may have been different. The defendant reasons that the guilty verdict

18

hinged on the testimony and credibility of Wilson and, therefore, trial counsel's failure to introduce the surveillance video severely prejudiced him.

¶ 58    Regarding Wilson's alleged inconsistent statements, the defendant points out that in her interview with the police on June 18, 2018, she reported that she, her aunt, and her cousin were sitting in back of a big group when she saw the car in which the defendant was a passenger drive by. Wilson stated that when the car drove past, she saw the defendant, but he did not see her at first. Wilson told the police that at some point the defendant saw her in the crowd that evening. At trial, Wilson testified that she saw the defendant in the passenger seat of the silver Mustang as it drove past her multiple times that night and that when she noticed the defendant look at her in the crowd, she backed up out of his vision. We do not find these statements to be inconsistent.

¶ 59    Assuming, *arguendo*, that there were minor discrepancies in Wilson's testimony regarding the exact moment that the defendant saw her outside of the bar on the night in question, it is not unreasonable to find that trial counsel, in the exercise of her professional judgment, concluded that whatever benefit might have been derived from impeaching Wilson's testimony on this issue would not be worth the inherent harm caused by allowing the jury to hear Wilson once again describe the defendant's threatening behavior that night. To the extent that inconsistent testimony existed, we find no ineffective assistance of counsel where the defendant failed to rebut the presumption that trial counsel engaged in trial strategy.

¶ 60    Regarding trial counsel's failure to use the surveillance video to show the jury which vehicle left the convenience store parking lot first, there could be no impeachment where Wilson never testified at trial as to which car left first. Rather, her trial testimony was that the parties "pulled off" in separate cars, and at some point after leaving the convenience store, she noticed

Pullen's car behind her. Accordingly, we cannot find that trial counsel's failure to cross-examine Wilson on this issue was objectively unreasonable.

¶ 61                                    III. Conclusion

¶ 62    For the reasons set forth above, we affirm the trial court's judgment and the imposition of consecutive sentences.


¶ 63    Affirmed.