2024 IL App (1st) 230509-U
No. 1-23-0509

FIRST DIVISION
November 25, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21 CR 5730 |
| | ) | |
| KEVIN LUCERO, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Joseph Cataldo, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* (1) The State's replaying of People's Exhibit 6 was harmless error. (2) The State proved beyond a reasonable doubt that defendant "displayed" a knife during all four acts of sexual penetration. (3) The circuit court did not consider an improper factor in sentencing.

¶ 2    Defendant Kevin Lucero appeals his conviction and sentence for aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1) (West 2020), home invasion (*id*. § 19-6(a)(2)), and aggravated criminal sexual abuse (*id*. § 11-1.60(a)(1)). He argues that (1) the circuit court erred by allowing the State to republish People's Exhibit 6 and by denying his motion for a new trial,

(2) the State failed to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt for counts two through four since the State failed to prove that he "displayed" a knife during these acts, and (3) the circuit court erred when it considered factors implicit in the offense of home invasion and aggravated criminal sexual assault as aggravating factors in sentencing. We affirm.

¶ 3                                    BACKGROUND

¶ 4        A grand jury indicted defendant with seventeen counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(1), (a)(2), (a)(4) (West 2020)), three counts of home invasion (*id.* § 19-6(a)(1), (a)(2), (a)(6)), one count of residential burglary (*id.* § 19-3(a)), four counts of aggravated criminal sexual abuse (*id.* § 11-1.60(a)(1), (a)(6)), one count of aggravated unlawful restraint (*id.* § 10-3.1(a)), and one count of criminal trespass to a residence (*id.* § 19-4(a)(2)) for actions committed against J.D. on March 28, 2021. The State *nolle prossed* most of the counts except four counts of aggravated criminal sexual assault (*id.* § 11-1.30(a)(1)), one count of home invasion (*id.* § 19-6(a)(2)), and one count of aggravated criminal sexual abuse (*id.* § 11-1.60(a)(1)).

¶ 5            Motion in Limine Regarding Video Surveillance Evidence of Defendant

¶ 6        Prior to trial, defense counsel filed a motion in limine to prohibit the State from introducing the video surveillance of defendant attempting to open other apartment doors in the apartment complex.[1] At the hearing on the motion, defense counsel argued that the video footage took place prior to the incident and did not include defendant entering J.D.'s apartment. Defense counsel contended that the video footage was not relevant to any of the counts and was highly prejudicial. The State argued that video footage took place immediately before defendant entered J.D.'s apartment, and it was probative as to how defendant entered J.D.'s apartment.

---

[1] People's Exhibit 6.

"MR. SHARMA [ASSISTANT STATE'S ATTORNEY]: So, the video would show that the defendant is going down hallways, opening doors. There's a couple that he peeks into, continues walking down the hallway. A few of the videos show that before he makes it up to the 4th floor where the victim's apartment is where we don't see him enter into the victim's apartment. There's no camera."
THE COURT: Is she going to say he entered into the apartment?
MR. SHARMA: Correct.
THE COURT: And she didn't know him?
MR. SHARMA: Correct.
THE COURT: All right. So, I think its relevant evidence. So that will be denied."

The circuit court denied the motion in limine.

¶ 7        The State introduced the video surveillance footage at trial as People's Exhibit 6. People's Exhibit 6 is a composite video of multiple time-stamped camera views of defendant's movements in the building. People's Exhibit 6 depicts an unidentified woman entering an apartment at approximately 11:44 p.m. on March 27, 2021. Seconds after she enters the apartment, defendant walks up to the door. He then moves further down the hallway and stops. He returns to the same apartment and peeks inside the door. He abruptly closes the door and then continues down the hallway. Seconds later, a man looks outside the apartment down the hallway towards defendant. The video then quickly cuts to defendant outside the same apartment at 11:49 p.m.

¶ 8        Defendant is seen in the lobby of J.D.'s building at approximately 12:00 a.m. on March 28, 2021. People's Exhibit 6 then shows defendant walking down the hallways attempting to open numerous apartment doors from approximately 12:00 a.m. to 12:09 a.m. on March 28, 2021. The last video shows defendant turning the corner away from J.D.'s apartment at approximately 3:49 a.m. on March 28, 2021.

¶ 9                                    Trial

¶ 10    At trial, J.D. testified that on March 27, 2021, she and her then two-year-old daughter lived in studio apartment 402 at 600 N. Salem Dr., Hoffman Estates, IL. On March 27, 2021, J.D. and her daughter spent the day at her aunt's house in Villa Park. They returned home at approximately 11:40 p.m. The State sought admission of People's Exhibit 1 into evidence. The circuit court admitted People's Exhibit 1 into evidence and published it to the jury. People's Exhibit 1 is a composite video of two time-stamped camera views of J.D.'s movements in the building. People's Exhibit 1 depicts surveillance footage of J.D. waiting for the elevator with her sleeping daughter in her arms at approximately 11:34 p.m. Another camera shows J.D. turning the corner to her apartment at approximately 11:35 p.m.

¶ 11    J.D. testified that she entered her apartment and did not lock the door because she had her daughter in her arms. J.D. placed her daughter in bed and then went to the bathroom. She took off her clothes in the bathroom and put her robe on. She opened the bathroom door and saw defendant standing in the doorway. She had never seen him before. She testified that she was scared because she did not know defendant and did not know whether he had a weapon. Defendant entered the apartment and immediately locked the door. He asked for Miguel's address and her phone number. Miguel was the father of her daughter, but he did not live with them. Defendant told J.D. that he was looking for Miguel because Miguel owed him money and had drugs in his possession. She wrote down the requested information on a piece of paper and gave it to defendant. Defendant placed the note in his pocket.

¶ 12    Defendant told J.D. that he wanted to take a photo of her with her robe off. He took the photo with a cellphone. J.D. told defendant that her name was Diana and her daughter's name was Dolci. She gave him fake names because defendant told her that he was part of a mafia and that he could kill her. He then asked her for a knife, which she gave to him. She testified that she

gave him the knife because she was terrified of what he might do to her daughter. At some point, J.D. screamed for help. Defendant lunged at her and placed his hand over her mouth. He told her, "[she was] not understanding this right." Defendant pointed the knife 8 inches from J.D.'s chest and told her that "if [she did not] let him have sex with [her, he will] have sex with [her] daughter." J.D. told him that it was not necessary to harm her daughter and that she would do everything he asked.

¶ 13     He then kissed her breasts, shoulders, and mouth. They were in the kitchen, only a few feet from where her daughter slept. He held the knife in front of J.D. He then penetrated her vagina with his penis. She could not recall whether he wore a condom, but he did not ejaculate. He stopped momentarily and spoke about his family. Defendant continued to talk about his family, but she stopped hearing him. J.D. testified that "[she did not] know why [she] stopped hearing him. He had the knife, holding the knife in his hands. My daughter was in the room. I was there."

¶ 14     The second sexual penetration took place on the sofa. J.D. was seated on the sofa. Defendant told her he wanted her to look at him because he did not want her to forget his face. He still had the knife in his hands. He penetrated her vagina with his penis. She asked him to stop because it hurt. He said that he was going to kill her.

¶ 15     The third sexual penetration took place on the sofa. Defendant told J.D. that he wanted her to put herself on top of him. She felt she had no choice, so she got on top of him. He then penetrated her vagina with his penis. He still held the knife in his hands. Her daughter remained asleep in bed a few feet away. During the third sexual penetration, J.D. looked at her daughter, hoping that she would not wake up. She worried that her daughter would wake up and cry and that defendant would hit her daughter.

¶ 16        Defendant looked at a cellphone and noted that it was late. He told J.D. that she was pretty and that if she did not call the police, he would take her out to breakfast the following morning. He gave her money and said, "thank you for your service." She thought he might leave. Instead, he laid her against the sofa and painfully penetrated her vagina with his penis. During the fourth sexual penetration, he placed the knife down on a table within his reach. He ejaculated on the sofa and part of the floor. He then pulled his pants up, put on her pink sweater, and put one of his chain necklaces on her. Defendant then left her apartment.

¶ 17        J.D. testified that she initially saw defendant standing in her doorway on March 27, 2021, at around 11:45 p.m. He left her apartment the following day at approximately 4:00 a.m. She recalled the approximate time because she picked up her phone when he left her apartment and used it to call the police. After hanging up her phone, she realized that she was bleeding from her vagina and in pain. The police arrived and asked her to step out onto her balcony. The police asked her to identify defendant whom they had arrested on the ground floor below. The police transported her to the hospital where a sexual assault kit was administered.

¶ 18        On cross-examination, J.D. testified that she was not menstruating on March 27, 2021, or March 28, 2021, or any time shortly after that. She clarified that the first time defendant penetrated her, he pressed on her shoulders and brought her to the floor, where he kissed her breasts, shoulders, and mouth. She was lying on her back, and he got on top of her. J.D. described defendant to the police operator as a man of medium height, with curly hair, and wearing ripped jeans. She did not remember telling the police operator that defendant was 24 years old. She did not remember telling the responding officers that defendant put down the knife after the second sexual penetration. She did not remember telling the nurse who administered the sexual assault kit that defendant performed oral sex on her. She did not recall telling Detective

Antonio Garcia or the assistant state's attorney that defendant held the knife toward her face. She told defendant when he entered her apartment that she wanted to scream. He immediately locked the door.

¶ 19 On redirect, J.D. testified that she communicated with the nurse through a Spanish interpreter over Facetime. She spoke to the assistant state's attorney through Detective Antonio Garcia, who acted as a Spanish interpreter. She clarified that when defendant asked her to do something, she felt he was making demands, and she did not have a choice.

¶ 20 Wenseslao Elias Mena testified that he was the maintenance supervisor at J.D.'s apartment building. Mena was familiar with the video surveillance system at the apartment building. There were 16 cameras in the apartment building that were continuously recording. When Mena learned about this case, he checked to see if the camera system recorded anything. He showed the police what the video surveillance system captured. The circuit court admitted the surveillance footage into evidence as People's Exhibit 6 and published it to the jury. The final clip of People's Exhibit 6 was recorded on Mena's cellphone and provided to the police.

¶ 21 Morgan Tripp testified that she worked as a nurse at the St. Alexius Medical Center on March 28, 2021. During her shift, she treated J.D. by administering a criminal sexual assault kit, which she provided to the police. J.D. informed Tripp that she felt pain in her pubic area and her left mid-back, and she had scratches on her upper buttock. On cross-examination, Tripp stated that J.D. informed her that defendant had oral contact with her vagina. Tripp did not perform an internal examination; the physician did. Tripp did not observe any bruising or abrasions on J.D.'s vaginal area. She also did not observe any bleeding.

¶ 22 Hoffman Estates Police Officer Clayton Johnson testified that he received an assignment to investigate a disturbance at 600 N. Salem on March 28, 2021, at approximately 4 a.m. When

he arrived, he went to J.D.'s apartment. He described J.D.'s apartment as small and cluttered. He noticed a knife on an end table. He photographed it and collected it into evidence. On cross-examination, Johnson testified that he did not observe any damage to the front door of J.D.'s apartment. He also noticed beer bottles on a table in her apartment.

¶ 23        Hoffman Estates Police Officer James Johnson testified that he was assigned as an evidence technician to 600 N. Salem on March 28, 2021. He collected a paper towel, cash, a blanket, a necklace, and three partially empty water bottles from J.D.'s apartment. On April 1, 2021, he executed a search warrant on defendant's apartment and recovered a pink sweater. On cross-examination, Johnson testified that there was no damage to the door of J.D.'s apartment. He also observed empty beer cans inside J.D.'s garbage and took a photo. On redirect, he testified that he did not know how long the beer cans were in J.D.'s garbage can or who drank them.

¶ 24        Hoffman Estates Police Officer Jennings testified that he was dispatched to 600 N. Salem on March 28, 2021. When he arrived, he was notified that a suspect was already in custody. He went to J.D.'s apartment and observed her crying and trembling. J.D. agreed to identify the suspect. She made a positive identification of defendant. On cross-examination, Jennings described J.D.'s apartment as messy and small. He took J.D. out on her fourth-floor balcony to identify defendant, who was below in the driveway. J.D. did not observe defendant for a long time. She made a quick positive identification and then ran back inside to vomit in the sink. On redirect, Jennings testified that lights were on defendant during the identification to provide a clear view.

¶ 25        Hoffman Estates Police Sergeant Giacone testified that he was dispatched to 600 N. Salem on March 28, 2021, at approximately 4:21 a.m. While Giacone set up a perimeter around

the apartment building, he observed defendant who matched the suspect's description. He put defendant in custody and told Jennings to have J.D. identify the suspect. Giacone illuminated defendant's face with his flashlight to enable J.D. to see him. J.D. made a positive identification, shrieked, cried, and ran inside the apartment. Giacone performed a custodial search of defendant at the police station and recovered a watch, a wallet, and a cellphone. On cross-examination, Giacone testified that defendant complied with his orders when he initially stopped him. Giacone did not mention J.D.'s shriek in his police report.

¶ 26 Hoffman Estates Detective Antonio Garcia testified that he assisted with the investigation of this case and provided interpretation services. During his investigation, Garcia learned that defendant lived in 700 N. Salem and J.D. lived in 600 N. Salem. The buildings were directly across from each other and were structured the same way. He also reviewed the surveillance footage. The circuit court republished People's Exhibit 6 over defense counsel's objection. The State paused the video throughout, and Garcia described the layout of the building. The State paused the video at defendant rounding the corner of a hallway at approximately 3:49 a.m. on March 28, 2021. Garcia testified that the hallway defendant came from led directly to J.D.'s apartment. He stated that J.D.'s apartment was the first door on the left side of the hallway. He also testified that the items recovered from defendant included a torn piece of paper with an address and phone number written on it.

¶ 27 On cross-examination, Garcia testified that he acted as an interpreter when J.D. spoke with the assistant state's attorney. During the interview, J.D. told the assistant state's attorney that defendant put the knife down after the second round of intercourse, not the third. She also said that defendant pointed the knife at her face, not her chest.

¶ 28     The parties stipulated that Cook County Sheriff Investigator Angel Lorenzo collected a buccal swab from Defendant, which was later transported to the Illinois State Forensic Science Laboratory. Illinois State Police Forensic Scientist Laurie Lee testified that she received a criminal sexual assault evidence kit containing samples from J.D., a DNA standard from J.D., and a DNA standard from defendant. She conducted DNA analysis on the vaginal swab and the left breast swab from J.D.'s sexual assault kit. She testified that defendant was a DNA contributor of both the vaginal swab and the left breast swab. The frequency of defendant's inclusion of the vaginal swab was one in 960 octillion unrelated individuals. The frequency of his inclusion of the left breast swab was one in 780 quadrillion unrelated individuals.

¶ 29     On cross-examination, Lee testified that the vaginal swab contained two male contributors. She differentiated them as "Male 1" and "Male 2" based on the amount of DNA in the mixture. Sperm DNA can remain inside a person for up to seven days and possibly longer. On redirect, Lee testified that there was more DNA from Male 1 in the DNA mixture on the vaginal swab. Male 1 was defendant.

¶ 30     The State rested.

¶ 31     Police Dispatcher Lex Cromien testified for the defense. Cromien received a 911 call from J.D. on March 21, 2021, at approximately 4:17 a.m. She used a Spanish interpreter for the call. J.D. told Cromien that defendant was 24 years old.

¶ 32     Defendant testified that he knew J.D. as Diana. He met J.D. in the parking lot area of 600 N. Salem in February 2021. J.D. offered him lotions and creams. She also asked him for money, which he gave her. J.D. had her daughter with her when they met. Defendant had sexual relations with J.D. for about a week, and then she asked him for money. They had sex in a car in the apartment building parking lot. Prior to March 28, 2021, they had sex approximately six to eight

times. They mostly had sex in a car but once had sex in a motel. He knew where J.D. lived since she had invited him to her apartment on a prior occasion.

¶ 33    On March 27, 2021, defendant started drinking beer and liquor with friends in his apartment at approximately 11:30 a.m. He went in and out of the 600 N. Salem building throughout the day because he had friends in the building. He admitted that he was the individual in People's Exhibit 6. He stated: "I was drinking with a friend that lives at the 600 building. I wanted to get to his apartment to grab my phone. Then I was opening doors. Then I ended up at her place doing the same thing." The cellphone in the surveillance footage belonged to his friend.

¶ 34    Defendant asked about J.D.'s daughter's father because he "[did not] want any problems" or "surprises." He clarified that he did not feel safe because of her daughter's father and mentioned prior conflicts with men related to women. On March 28, 2021, defendant went up to J.D.'s apartment. Her door was closed. He did not knock and entered the apartment. He immediately saw J.D. when he entered the apartment. He did not lock the door. He recognized that her daughter was in the apartment. He did not know why J.D. wrote down Miguel's address and her phone number. J.D. did not ask him to leave. He asked her for a knife because he did not feel safe "[b]ecause of the baby's father." He immediately put it down on the little table next to the sofa and never picked it up again that evening.

¶ 35    He and J.D. had sexual intercourse. He remembered three positions. He took a photo of J.D. with his friend's cellphone. He did not threaten J.D. or her daughter. He gave her money because she asked for a loan. He put his chain on her because she liked it. He asked her for a sweater so he could go to his apartment to grab a carton of cigarettes and return. He did not tell her not to call the police. He was 24 years old on March 28, 2021.

¶ 36    On cross-examination, the State republished People's Exhibit 6 without objection. Defendant admitted to being the individual throughout the surveillance footage. He admitted that he was wearing J.D.'s pink sweater at the end of the video. He did not buy any creams or lotions from J.D. He loaned J.D. $200 the first time she asked him for money. He did not recall whether J.D.'s daughter was in the car the first time they had sex. He stated that sometimes her daughter was present when they had sex, and other times she was not. He said that sometimes the main entrance to 600 N. Salem required a password, and sometimes it did not. He testified that "it had to have been unlocked [on March 27, 2021] because I went in."

¶ 37    They did not have sex on the bed. He never locked the apartment door. He denied threatening to have sex with J.D.'s daughter. He denied threatening to kill her and her daughter if she called the police. He did not remember the name of the motel, and he did not pay for it.

¶ 38    The defense rested, and the State rested in rebuttal. The jury found defendant guilty of all charges. Defense counsel filed a motion for a new trial. In the motion, defense counsel argued that the circuit court erred in allowing the State to republish People's Exhibit 6 to the jury. The circuit court denied the motion

¶ 39                              Sentencing Hearing

¶ 40    At the sentencing hearing, the State argued in aggravation that defendant's conduct caused serious physical and psychological harm, that defendant was a danger to the public, and that the court should consider J.D.'s gender since it made her vulnerable to this crime. In mitigation, defense counsel argued that defendant was young and grew up in an economically disadvantaged background. He had three children that he spoke to frequently and supported financially. Defendant worked two jobs, did not have problems with drugs or alcohol, and had no prior criminal history. Defense counsel requested the minimum sentence.

¶ 41    Defendant addressed the court in his statement of allocution. He said, "[t]his is craziness what's happening to me." He mentioned that he had a family, and believed he deserved a second chance because people learn from their mistakes. He said, "[t]he maximum sentence is the person that carries my cost without knowing the reality and truth. I'm calm."

¶ 42    Prior to sentencing defendant, the circuit court stated:

> "The Court has considered the pre-sentence investigation report, the arguments of counsels, the statements in elocution, all statutory and non-statutory factors in aggravation-mitigation.
> Whether specifically mentioned or not, the history and the character of the defendant, having due regard for the seriousness of the offense and with the objective of restoring the defendant to useful citizenship, the Court finds that in review of the pre-sentence investigation, the defendant doesn't have any criminal history of any significance.
> I do have to note the nature of the crime that the defendant is seen walking the halls of the building apparently possibly checking doors, entering the victim's apartment uninvited late at night, concerning act in itself.
> Once inside, the defendant – there's a small child sleeping – using a deadly weapon, a knife. It's a lengthy act of sexual assault of the victim with the child present. I can't overlook the nature of that offense, just coming into someone's home like that and the acts that were committed within."

The circuit court sentenced defendant to 17 years on each of the four counts of aggravated criminal sexual assault to be served consecutively to each other, six years for home invasion to be served consecutively to the sexual assault counts, and four years for aggravated criminal sexual abuse to be served concurrently.

¶ 43    Defendant appealed.

¶ 44                                    ANALYSIS

¶ 45                          Evidence of Other Crimes

¶ 46    Defendant contends that the circuit court erred by allowing the State to republish People's Exhibit 6 and by denying his motion for a new trial. He argues that the reintroduction of the evidence resulted in unfair prejudice and the denial of a fair trial.

¶ 47        "The admission of evidence lies within the sound discretion of the trial court, and a reviewing court will review the trial court's ruling only for an abuse of discretion." *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 31. Likewise, "[t]he denial of a motion for a new trial will not be disturbed on review in the absence of a showing that the trial court abused its discretion." *People v. Hall*, 194 Ill. 2d 305, 343 (2000). "An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the court." *People v. Perkins*, 2018 IL App (1st) 133981, ¶ 53. "We may affirm the trial court when correct for any reason appearing in the record." *Id*.

¶ 48        "The term 'other-crimes evidence' encompasses misconduct and criminal acts that occurred before or after the alleged charged conduct, including acts or misconduct for which the defendant was not charged or convicted." *People v. Adams*, 2023 IL App (2d) 220061, ¶ 67. "Different evidentiary rules apply regarding evidence of other crimes that are unrelated to the charged offenses and other crimes evidence that is 'part and parcel' of the charged offenses***." *People v. Morales*, 2012 IL App (1st) 101911, ¶ 24. "Under the latter circumstance, the admission of evidence that includes proof of other crimes is analyzed 'under ordinary relevancy principles.' " *Morales*, 2012 IL App (1st) 101911, ¶ 24 (quoting *People v. Manuel*, 294 Ill. App. 3d 113, 124 (1st Dist. 1997).

¶ 49        "The shorthand distinction regarding such evidence is whether the contested evidence is *extrinsic* or *intrinsic* to the charged offense." (Emphasis in original.) *Morales*, 2012 IL App (1st) 101911, ¶ 24. If the evidence is extrinsic to the charged offense, then it may not be admitted to demonstrate defendant's propensity to commit the crime charged, but may be admitted if relevant to prove some other material question at trial. *Id*. "If the contested evidence concerns intrinsic acts, that is, the evidence concerns 'a necessary preliminary to the current offense,' then

the evidence is admissible under principles of ordinary relevance." *Id*. (quoting *Manuel*, 294 Ill. App. 3d at 124). "Stated differently, if the prior crime is part of the 'course of conduct' leading up to the crime charged, then it constitutes intrinsic evidence of the charged offense and its admissibility is not analyzed as 'other crimes' evidence***." *Id.* ¶ 25. Further, intrinsic acts do not require a limiting instruction. *People v. Figueroa*, 341 Ill. App. 3d 665, 672 (1st Dist. 2003).

¶ 50        People's Exhibit 1 depicted J.D. turning the corner to her apartment at approximately 11:35 p.m. on March 27, 2021. J.D. testified that she returned home at approximately 11:40 p.m. She then put her daughter to sleep and went to the bathroom without locking the front door. After using the bathroom, she took off her clothes and put on her robe. When she opened the bathroom door, she saw defendant standing in the doorway of her apartment. People's Exhibit 6 showed defendant roaming the halls of J.D.'s apartment building and attempting to open apartment doors from approximately 11:44 p.m. to 12:10 p.m. on March 27, 2021.

¶ 51        People's Exhibit 6 depicted defendant attempting to open other apartments without permission immediately before he enters J.D.'s apartment and has sex with her. While People's Exhibit 6 did depict defendant committing prior bad acts, the prior bad acts are intrinsic evidence of the crimes charged since they are part of the "course of conduct" leading up to the charged crimes. *Morales*, 2012 IL App (1st) 101911, ¶ 25. Accordingly, People's Exhibit 6 is analyzed under ordinary relevancy principles. *Id.* ¶ 24.

¶ 52        " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" Ill. R. Evid. 401 (eff. Jan. 1, 2011). "All relevant evidence is admissible, except as otherwise provided by law. Evidence which is not relevant is not admissible." Ill. R. Evid. 402 (eff. Jan. 1, 2011). "Although relevant, evidence may be excluded

if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, *or needless presentation of cumulative evidence*." [Emphasis added.] Ill. R. Evid. 403 (eff. Jan. 1, 2011). "In the context of determining whether the prejudicial effect of the evidence substantially outweighs its probative value, our supreme court has recognized that prejudice means 'an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror.' " *People v. Barnes*, 2013 IL App (1st) 112873, ¶ 44 (quoting *People v. Eyler*, 133 Ill. 2d 173, 218 (1989)).

¶ 53    Defendant testified that he and J.D. had a preexisting sexual relationship, and he indicated that they had consensual sex on March 27, 2021. In contrast, J.D. testified that upon exiting her bathroom, she saw defendant, whom she had never seen before, standing in the doorway of her apartment. He then entered her apartment and physically and verbally threatened her to have sex with him.

¶ 54    Since there was no video evidence of defendant entering J.D.'s apartment, the surveillance footage of defendant attempting to open other apartment doors in J.D.'s apartment building had probative value as to whether defendant legitimately entered J.D.'s apartment.

¶ 55    The surveillance footage also had probative value as to whether defendant was credible. "The function of a jury is 'to assess the credibility of witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence.' " *People v. Epstein*, 2022 IL 127824, ¶ 21 (quoting *People v. Ward*, 2011 IL 108690, ¶ 34). "To perform its function properly, the jury must be given as much relevant, admissible evidence as possible." *Epstein*, 2022 IL 127824, ¶ 21. Defendant testified that he roamed the halls of the apartment building, opening doors because he wanted to get his phone from his friend's apartment, and that

he ended up at J.D.'s apartment "doing the same thing." The jury was entitled to view People's Exhibit 6 to determine whether they believed defendant's version of events. The jury was not required to rely solely on defendant's testimony regarding his actions in the apartment building when there was a video from which the jury could draw their own conclusions.

¶ 56 Moreover, the probative value of People's Exhibit 6 outweighed any prejudicial effect. On its face, there is nothing inherently prejudicial about a video of defendant roaming the hallways of an apartment building and attempting to open apartment doors without permission. Simply put, the admission of People's Exhibit 6 would not lead the jury to decide this case on an improper, emotional basis, such as sympathy, hatred, contempt, or horror. *Barnes*, 2013 IL App (1st) 112873, ¶ 44. Defendant concedes that People's Exhibit 6 contained some probative value but argues that the repeated use of it amplified the danger of unfair prejudice.

¶ 57 Defendant contends that the State's republishing of People's Exhibit 6 during their case-in-chief and on cross-examination amplified the danger of unfair prejudice. Generally, "[t]o preserve an issue for review, a defendant must both object at trial and raise the issue in a posttrial motion." *People v. Lewis*, 223 Ill. 2d 393, 400 (2006). Here, defense counsel only objected to the State republishing People's Exhibit 6 during its case-in-chief. Defendant does not advance any argument articulating how the alleged error of republishing People's Exhibit 6 during cross-examination was preserved for review, or why plain-error should apply. Accordingly, defendant has arguably forfeited argument as to the third showing of People's Exhibit 6. *In re Marriage of Baumgartner*, 237 Ill. 2d 468, 474-75 (quoting *People v. Szabo*, 109 Ill. App. 3d 824, 825-26 (1982)) (" '[A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' "); *People v. Ramirez*, 2013 IL App (4th) 121153, ¶¶ 73-73 (In plain-

error review, the defendant bears the burden of persuasion, and we will not find plain-error where defendant's brief is bereft of any argument as to why plain-error should apply). Assuming, *arguendo*, that defense counsel did preserve the third showing of People's Exhibit 6 for review, it would not change our analysis.

¶ 58    "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, *or needless presentation of cumulative evidence*." [Emphasis added.] Ill. R. Evid. 403 (eff. Jan. 1, 2011). "Evidence is considered cumulative when it adds nothing to what was already before the jury." *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). The admission of cumulative evidence is within the discretion of the trial court and its ruling will not be reverse absent an abuse of discretion. *People v. Tolliver*, 347 Ill. App. 3d 203, 227 (1st Dist. 1004). "An abuse of discretion occurs where the trial court's ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would take the view adopted by the court." *Perkins*, 2018 IL App (1st) 133981, ¶ 53.

¶ 59    Here, the second and third showings of People's Exhibit 6 were cumulative since it "add[ed] nothing to what was already before the jury" (*Ortiz*, 235 Ill. 2d at 335) since the jury previously viewed the video. The circuit court's needless republishing of cumulative evidence was unreasonable since its unclear what probative value a second and third viewing of People's Exhibit 6 provided the jury. Nonetheless, any error in the admission (or in this case republishing) of such evidence is subject to harmless error analysis. That is, even the erroneous admission of evidence does not warrant reversal if this court cannot determine it had prejudicial effect. "Error will be deemed harmless and a new trial unnecessary when 'the competent evidence in the record establishes the defendant's guilt beyond a reasonable doubt and it can be concluded that retrial

without the erroneous admission of the challenged evidence would produce no different result.' " *People v. McKown*, 236 Ill. 2d 278, 312 (2010) (quoting *People v. Arman*, 131 Ill. 2d 115, 124 (1989)

¶ 60     Defendant's claim hinges solely on the alleged prejudicial effect of the subsequent second and third viewings of the same footage. However, we find it hard to believe that the jury would have reached a different verdict even if they had only seen the video footage once. It is evident that jury accepted J.D.'s testimony about the sexual assault over defendant's conflicting account of a consensual encounter. *Infra* ¶¶ 62-66. Thus, we cannot conclude that the verdict would have been different whether the jury viewed the video footage one or three times. Consequently, any error from the repeated viewings was harmless and does not warrant reversal.

¶ 61                                Sufficiency of the Evidence

¶ 62     Defendant argues that the State failed to prove him guilty of aggravated criminal sexual assault beyond a reasonable doubt for counts two through four since the State failed to prove that he "displayed" a knife during these acts.

¶ 63     When a defendant makes a challenge to the sufficiency of the evidence, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[I]n weighing evidence, the trier of fact is not required to disregard inferences which flow normally from the evidence before it, nor need it search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). "When presented with a challenge to the sufficiency of the evidence, it is not the function of this court to retry the

defendant." *Collins*, 106 Ill. 2d at 261. Thus, "the reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). "A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Belknap*, 2014 IL 117094, ¶ 67. We apply this standard of review "regardless of whether the evidence is direct or circumstantial." *People v. Norris*, 399 Ill. App. 3d 525, 531 (2010).

¶ 64    "A person commits aggravated criminal sexual assault if that person commits criminal sexual assault and during the commission of the offense***: the person displays, threatens to use, or uses a dangerous weapon***." 720 ILCS 5/11-1.30(a)(1) (West 2020). "***A threat of force precedes the sexual penetration by some amount of time; it lingers over the victim, who is subdued precisely because the victim has a reasonable belief that the accused 'has the ability to execute that threat' of force." *People v. Smith*, 2019 IL App (1st) 161246, ¶ 31 (quoting 720 ILCS 5/11-0.1 (West 2020). "[T]he 'offense' of criminal sexual assault does not begin and end at the fixed point in time of the sexual penetration." *Smith*, 2019 IL App (1st) 161246, ¶ 32. "It begins when the offender first uses force or the threat of force along the way toward ultimately accomplishing sexual penetration." *Id*. "So when the aggravated criminal sexual assault statute provides for the aggravation of the crime based on the 'display, threat[] to use, or use' of a dangerous weapon 'during the commission of the offense,' the phrase 'during the commission of the offense' must include the period of time in which the offender used or threatened force. [Citation.]" *Id*. "The requirement that the [dangerous weapon] be displayed 'during the commission of the offense' does not require that it be displayed at *all* times during its commission." (Emphasis in original.) *Id*. ¶ 36.

¶ 65 We are not persuaded by defendant's argument that he needed to make "an ostentatious showing of the knife" prior to each sexual penetration or his attempt to distinguish this case from *Smith*. Rather, we find *Smith* is dispositive. Here, J.D. testified that defendant took the knife from her and placed it 8 inches from her chest. Defendant then told J.D. that "if [she did not] let him have sex with [her], he'll have sex with [her] daughter." She screamed for help, and he lunged towards her and covered her mouth with his hand. He told her that "[she was] not understanding this right." He then penetrated her vagina with his penis. J.D. testified that he held the knife in his hands during the second and third sexual penetrations. She also testified that he placed the knife within his reach the fourth sexual penetration. In effect, the knife was displayed for all four acts of sexual assault, and the threat of defendant using the knife lingered over J.D. Our analysis would remain the same, if the knife were placed within defendant's reach after the second sexual penetration since the knife was "always looming as an option for defendant if his victim did not comply." *Smith*, 2019 IL App (1st) 161246, ¶ 38.

¶ 66 Viewing the evidence in the light most favorable to the prosecution, the jury could have found that defendant displayed a knife during the commission of all four offenses of aggravated criminal sexual assault. Accordingly, the State proved, beyond a reasonable doubt, that defendant committed four counts of aggravated criminal sexual assault.

¶ 67 Sentencing

¶ 68 Defendant argues that the circuit court erred when it considered factors implicit in the offense of home invasion and aggravated criminal sexual assault as aggravating factors in sentencing. Specifically, he contends that the circuit court considered his unlawful entry and his use of a knife. Defendant concedes that he did not preserve this error for review but seeks review under the plain error doctrine or ineffective assistance of counsel.

¶ 69        "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "The first step in analysis is to determine whether a clear, obvious, or plain error has been committed." *People v. Mitok*, 2018 IL App (3d) 160743, ¶ 8.

¶ 70        "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' *Id*. (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

¶ 71        "Generally, a factor implicit in the offense for which the defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense." *People v. Phelps*, 211 Ill. 2d 1, 11 (2004). "Such dual use of a single factor is often referred to as a 'double enhancement.' " Id. at 12 (quoting *People v. Gonzalez*, 151 Ill. 2d 79, 85 (1992)). "This rule is not meant to apply rigidly because public policy dictates that a sentence be varied in accordance with the circumstances of the offense." *People v. Sanders*, 2016 IL App (3d) 130511, ¶ 13. As such, "[t]he court may consider the nature and circumstances of an offense, including the nature and extent of each element of the offense as committed by the defendant." *Id*. "A court is not

required to refrain from any mention of sentencing factors that constitute elements of the offense." *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 52.

¶ 72     In determining whether the court based the sentence on an improper factor, "a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). "The defendant bears the burden of establishing that a sentence was based on an improper consideration, and we will not vacate a sentence based upon an improper factor if we can determine from the record that the weight placed on the improperly considered factor was so insignificant that it did not lead to a greater sentence." *People v. Sherman*, 2020 IL App (1st) 172162, ¶ 52. Whether the court relied on an improper factor in imposing a sentence is a question of law we review *de novo. People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8.

¶ 73     Regarding the circuit court's three references to defendant entering the apartment uninvited, the circuit court sentenced defendant to six years of imprisonment for his Class X felony conviction for home invasion. 720 ILCS 5/19-6(a)(2) (West 2020). "Home invasion in violation of subsection *** (a)(2) *** is a Class X felony." *Id.* § 19-6(c). "For a Class X felony *** [t]he sentence of imprisonment shall be a determinate sentence *** of not less than 6 years and not more than 30 years." 735 ILCS 5/5-4.5-25(a) (West 2020). Since defendant received the minimum sentence, he cannot establish that an improper factor led to a greater sentence. *Sherman*, 2020 IL App (1st) 172162, ¶ 52. Moreover, prior to its references to defendant entering the apartment uninvited, the circuit court twice stated that it was considering the nature of the crime. Based on the entire record (*Dowding*, 388 Ill. App. 3d at 943), the circuit court's brief consideration of the nature and circumstances of the offense (*Sanders*, 2016 IL App (3d) 130511, ¶ 13) was not improper.

¶ 74    Similarly, prior to its single reference to "a knife," the circuit court twice stated that it was considering the nature of the offense. This was not improper. Additionally, the court sentenced defendant to 17 years of imprisonment for each of his convictions of aggravated criminal sexual assault. 720 ILCS 5/11-1.30(a)(1) (West 2020). "A violation of subsection (a)(1) is a Class X felony for which 10 years shall be added to the term of imprisonment imposed by the court." *Id.* § 11-1.30(d)(1). Again, the sentence for a Class X felony shall be not less than 6 years and not more than 30 years. 735 ILCS 5/5-4.5-25(a) (West 2020). Defendant could have received a sentence of 16 years to 40 years for each count of aggravated criminal sexual assault. Defendant received a sentence of only one year over the minimum possible sentence for each count, which was well within the applicable statutory range (*People v. Busse*, 2016 IL App (1st) 142941, ¶ 27 (a sentence that falls within the statutorily prescribed range is presumptively valid)).

¶ 75    The record fails to establish that the circuit court considered an improper factor in imposing defendant's sentences for home invasion and aggravated criminal sexual assault. Since we found no error, our plain-error analysis ends here. See *People v. Hanson*, 238 Ill. 2d 74, 115 (2010). Furthermore, since the circuit court did not err when it sentenced defendant, defense counsel cannot be ineffective for failing to object. See *id*.

¶ 76                                    CONCLUSION

¶ 77    For the reasons stated above, we affirm defendant's conviction and sentence.

¶ 78    Affirmed.