2026 IL App (1st) 240133-U
No. 1-24-0133

SIXTH DIVISION
January 23, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 14 CR 18967 |
| | ) | |
| NEHEMIAH SPENCER, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Charles P. Burns, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's convictions for first degree murder and aggravated battery with a deadly weapon are affirmed where (1) the trial court did not err by allowing the State to present evidence of his other crimes, and (2) defendant's trial counsel was not ineffective for failing to request a limiting instruction regarding the other-crimes evidence.

¶ 2    Following a jury trial, defendant Nehemiah Spencer was found guilty of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2014)) and aggravated battery with a deadly weapon (*id*. § 12-3.05(f)(1) (West 2014)). He was sentenced to concurrent terms of 31 years' and 5 years' imprisonment. On appeal, defendant contends that the trial court erred by allowing the State to present extensive other-crimes evidence to prove his propensity for violence, and that his trial

counsel was ineffective in failing to request a limiting instruction regarding this evidence. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged by indictment with eight counts of the first-degree murder of Leroyce Noel (*id*. § 9-1(a)(1)-(2) (West 2014)), one count of the attempted first-degree murder of Matthew Carr (*id*. § 9-1(a)(2) (West 2014); *id*. § 8-4(a) (West 2014)), and four counts of the aggravated battery of Carr with a knife (*id*. § 12-3.05(a)(1), (f)(1) (West 2014)). The charges arose from events on September 27, 2014, in which defendant allegedly stabbed Noel and Carr with a knife, resulting in Noel's death.

¶ 5        In 2018, defendant was found guilty of first-degree murder and aggravated battery after a jury trial, and the court sentenced him to concurrent terms of 35 years' and 5 years' imprisonment. On direct appeal, we reversed and remanded for a new trial because the trial court failed to instruct the jury on self-defense, but we otherwise affirmed the trial court's denial of defendant's motion *in limine* to present evidence of the victim's violent character. *People v. Spencer*, 2021 IL App (1st) 181807-U.

¶ 6                                 A. Pretrial Proceedings

¶ 7        Before the trial on remand, the State filed a motion *in limine* to admit evidence that on the day of the incident, at the same location, defendant verbally and physically fought with his then girlfriend, A.C., over her decision to take their children to Wisconsin. The State sought to introduce evidence that defendant beat A.C., held a knife to her neck, and stopped her from removing the children, including breaking her phone when she called a friend for a ride. During their argument defendant armed himself with a "curved, bear claw knife." Then, Carr and Noel arrived at the apartment.

¶ 8    Defense counsel responded that the incidents in the State's motion were "unreliable" and more prejudicial than probative. Defense counsel contended that no evidence corroborated A.C.'s account and that her statements were made to the State over eight years after the incident.

¶ 9    The court granted the State's motion, finding that the incident was "consistent with the course of action here." The court also found that the evidence relevant to defendant's potential motive, given the context that led to Noel and Carr arriving at the apartment. The court determined that the probative value outweighed the prejudicial effect.

¶ 10    The following exchange on the record occurred:

"[Defense Counsel]: Judge, are you allowing this as a proof of other crime or is this simply as relevant evidence without the limiting instruction?

The Court: I would do a limiting instruction on that.

[Defense Counsel]: Okay. So for course of action and motive?

The Court: Right."

¶ 11                           B. Jury Trial and Sentencing

¶ 12    The matter proceeded to a jury trial on one count each of first-degree murder, alleging defendant's knowledge that his acts would create a strong probability of Noel's death, and aggravated battery of Carr with a deadly weapon. At trial, A.C. testified that on September 27, 2014, she lived with defendant, their two children, defendant's mother, and defendant's brother in an apartment. That morning, A.C. and defendant argued because he believed that A.C. was cheating on him. In the afternoon, defendant struck A.C.'s cheek with his hand "repeatedly," "slammed" her on the ground, and choked her while her children were in the room. Defendant also attempted to stab A.C.'s throat with a long, "pointed" knife. This blade is described in various

ways, including as an "ice pick." The wound bled, but defendant did not "puncture all the way through."

¶ 13    Defendant's brother removed the children from the room as this was happening. Defendant continued to beat A.C. for two hours. A.C. did not fight back because she "just wanted it to be over." A.C. testified that the beating resulted in injuries including a "full black eye *** and one that was starting," a puncture wound on her neck, and bruising on her back and legs.

¶ 14    A.C. had also called her aunt who lived in Chicago to ask her for help, dressed herself and the children, and packed bags. A.C. also called other friends and relatives, including "Cantrell" who is a friend of the family. "All of them" stated that they would come pick her up. During this time, defendant periodically took A.C.'s phone from her. She told him "multiple times" that she wanted to leave and that a family member would come to the apartment get her; she was unsure who would come, although she mentioned an "Uncle Matthew." In response, defendant told A.C. "b***, you're not going nowhere, nor is my kids," and hit her. A.C. put her bags near the front door, and defendant fought with A.C. again, prompting defendant's mother to take the children to the back of the apartment.

¶ 15    A.C. heard a knock at the door and Carr's voice. Defendant opened the front door, and Noel and Carr were standing on the other side of the door. A.C. described Noel as her "god-brother." Noel entered the apartment first and asked where the bags were. When Noel attempted to take the bags in the hallway, defendant stabbed him with a curved knife. Noel fell to the floor and stayed there. Defendant's mother then "snatched" A.C. "by the back of [her] head" and began hitting her on the head, face, back, and sides.

¶ 16    Defendant's brother came out of the hallway holding a machete and made a thrusting gesture with it. Defendant and his brother moved to the front of the apartment with Carr.

Defendant's brother then held his machete to Carr's throat and moved with Carr to the front door; Carr left the apartment. Defendant's mother then "pushed" A.C. out of the apartment, but allowed A.C. to reenter the apartment to retrieve the children. Right before A.C. left the apartment for the final time, she saw defendant and his brother moving Noel to the brother's room. A.C. did not see Noel or Carr with a weapon and testified that they did not enter the apartment forcefully or aggressively.

¶ 17    A.C. and her children moved outside the building, and she saw Carr by the gate. He was bleeding from his back and hands. Defendant opened a window and screamed, "I killed your friend and now he going [*sic*] to bleed out." Defendant also called defendant "names" and said "a lot of unnecessary stuff." Defendant's mother moved him from the window. A.C. identified photographs depicting the inside and outside of the apartment, including the weapons in the apartment, which are included in the record and have been viewed by this court.

¶ 18    On September 28, 2014, A.C. gave an electronically recorded statement to the police identifying defendant as the person who stabbed Noel. She also testified before a grand jury that defendant stabbed Noel.

¶ 19    On cross-examination, A.C. denied finding text messages on defendant's phone which she interpreted as proof of his cheating on her, and stated that defendant did not have a phone. A.C. also denied fighting with defendant regarding his not wanting her to take the children to Milwaukee because she had not enrolled the eldest in school. She further denied that defendant was concerned about a sex offender living in the home in Milwaukee where A.C. wanted to move with the children.

¶ 20    A.C. agreed with defense counsel's assertion that defendant began to beat her at 1 p.m. and beat her the "whole time" until Noel and Carr arrived. She stated that she called out for help but

no one helped her. She spoke with Chicago police officer Brian Bratton at the scene and told him that defendant hit her "everywhere." Officer Bratton asked her to be specific, and she told him that defendant punched her face and choked her. A.C. also denied that she told Bratton or the detectives that defendant stabbed her throat and beat her "all over" her body for "two hours straight" or that defendant held her against her will and took her phone. She also denied that she told anyone about defendant's mother giving him the knife until right before trial.

¶ 21    A.C. stated that she had visible injuries, including black eyes, when the officers arrived, but she refused medical attention. She also stated that the police did not take pictures of her injuries, but she had her own pictures taken after she left the police station. A.C. did not provide pictures to the police or State because "no one asked for them."

¶ 22    A.C. stated that she was "terrified" and called the police before Noel and Carr arrived at the apartment. A.C. did not tell defendant that Carr would arrive to get her because defendant was "right there listening in on every single call." A.C. also denied that defendant went to the store during the argument because his mother attempted to break up their argument. Before defendant attacked A.C., she saw him go to his brother's room to smoke marijuana with his brother and another woman named "Shanna." Shanna did not help A.C. when she screamed for help. A.C. denied involving other people in prior disagreements with defendant and telling Carr to "break the damn door down if [he has] to." A.C. stated that nobody "was beating on" defendant and she did not know why defendant stabbed Noel. She also denied that Carr tried to fight defendant's brother. A.C. denied discussing the events with other witnesses before trial.

¶ 23    Cantrell Alexander, A.C.'s cousin, testified that on September 27, 2014, she called him and seemed "[f]rantic." When he received the call, he was driving to visit a cousin. Afterward, he drove to see Carr, who was A.C.'s uncle and his cousin. He and Carr decided see A.C. before Noel, a

family friend, arrived and spoke with Carr before they left. Noel rode with Alexander and Carr to pick up A.C. The demeanor of the passengers was "good," and they did not develop a plan for their arrival and were not armed. When they arrived, Alexander stayed in the car while Noel and Carr went into the apartment. Five minutes later, Carr exited, seeming "[f]rantic" and bleeding from his right hand, as he left the building. Carr also had three or four puncture wounds on his back that were bleeding. Carr approached the passenger's side and asked Alexander to call the police. Alexander did so and handed the phone to Carr.

¶ 24    Eventually A.C. came downstairs also seeming "frantic," but returned upstairs for her children. A couple minutes later she returned with the children. A.C. was on the phone with the police when defendant opened a second-floor window and told Carr in an angry tone that his "boy [was] going to bleed to death."

¶ 25    Carr testified that before the incident, he did not have a contentious relationship with defendant. Cantrell drove him and Noel to defendant's apartment to "get [A.C.'s] clothes, her, and her kids." They were joking, talking, and listening to the radio during the drive. When they arrived, Carr and Noel entered the building and heard A.C. and defendant through the front door to their apartment. Carr said that while in the hallway, the door "swung open," defendant stood in the doorway, and A.C. was three or four feet behind him.

¶ 26    Noel entered the apartment first and they both saw A.C.'s bagged clothing near the door. Carr bent over to pick up the bags and saw defendant "lunging" at Noel with his hand toward Noel's chest. Noel then bent over like he was about to "hug" defendant, and defendant removed his arm from Noel's chest and pushed Noel to the floor; Noel did not move. At that point, Carr saw that defendant was holding a curved hunting knife, which he identified in court. Carr was afraid of getting stabbed so he grabbed the knife by its blade. Defendant tried to "yank" the blade

from Carr's hand, so Carr struck defendant's face with his left fist, but defendant did not let go of the knife. Defendant and Carr fought "all the way through the hallway towards the back by the washroom and the kitchen" with defendant pulling Carr further into the apartment.

¶ 27    Carr then felt a sharp pain in his back, and saw defendant raise the ice pick in his free hand. Carr was afraid that defendant would strike again, so he grabbed defendant's other arm as well. They were "entangle[d] and *** struggling," with Carr trying to leave the apartment and defendant pulling Carr toward the back. Then, defendant's brother approached them and placed a machete to the back of Carr's neck and said that if Carr did not "let go" of defendant then he would "chop [his] f*** head off." Carr continued to hold defendant because he was afraid, but eventually let go. Defendant's brother held the machete to his back and walked him out of the apartment and down the stairs. Carr identified the machete in court. On the way, Carr saw Noel still lying on the floor and A.C. and defendant's mother having a "confrontation" in the front of the apartment.

¶ 28    Outside, Carr asked Alexander to call the police, and 15 to 20 minutes later A.C. left the building alone. She was "crying" and "hysterical" because "they" did not "want to release her kids to her." Defendant opened the apartment window and said in a "[v]ery angry" tone that "[Carr's] dead homey [is] up there bleeding out, [defendant] killed [Carr's] homey." Neither Carr nor Noel were armed. At the time of trial, Carr was unable to bend his ring and pinky fingers or make a fist due to his injuries.

¶ 29    On cross-examination, Carr said that he did not recall if A.C. called him on September 27, 2014. Defense counsel impeached Carr using his grand jury testimony wherein he testified that A.C. had called him that day. He stated that defendant's brother never held the machete to his neck when he escorted him from the apartment. During this time, defendant attempted to "come after"

Carr, but his brother told him to "stop." Carr did not see Noel armed with weapons but also did not ask him if he was armed.

¶ 30    Forensic scientist Angela Kaeshamer testified that she analyzed DNA samples related to the incident, using a blood standard from Noel, and buccal standards from defendant and Carr. She discovered mixtures of DNA profiles from multiple people on swabs taken from the machete handle, ice pick handle, and blood from the blade of the curved knife, which were found to be "potentially incomplete and not suitable for comparisons." The DNA analysis of the swab from blood taken from the ice pick matched the DNA profile of Noel. The swab from the handle of the curved knife yielded a mixture of DNA profiles for two people: the "major" DNA profile matched the profile of Carr and did not match Noel or defendant, and defendant could not be excluded from having contributed to the "minor" DNA profile. Blood is a "richer source of DNA" compared to "touch DNA."

¶ 31    Chief Medical Examiner Dr. Ponni Arunkumar testified that she reviewed the records and reports related to Noel's autopsy. She noted evidence of multiple sharp and blunt force injuries, the most significant of which was a four-inch-deep vertical stab wound on Noel's left chest. This wound traveled through the space between the ribs, penetrating the pericardium and the right ventricle of his heart. Dr. Arunkumar approximated that 11 pounds of pressure was necessary to make the stab wound, the equivalent to "the force required to stab or penetrate a melon." Noel also had multiple sharp force injuries on the back of his left thigh, and blunt force injury to his head, that could have been caused by a "collapse onto the floor." She testified that the cause of Noel's death was the stab wound in his chest and the manner of death was homicide.

¶ 32    Officer Bratton testified that he and his partner, Chicago police officer Fadi Ahmad, responded, and he saw A.C. and Carr standing outside the building. A.C. was yelling and

"hysterical," while Carr seemed more "in shock." When he went to the apartment, Bratton was directed to a bedroom where he saw Noel lying on the ground behind the door. Noel was not moving or responding to Bratton's questions. Bratton called the Chicago Fire Department and waited until they arrived.

¶ 33      On cross-examination, Bratton denied being present when Officer Ahmad spoke with A.C., and he did not observe any physical injuries on A.C. who refused medical treatment and assistance. On redirect examination, Bratton said he had responded to calls with allegations of fist fights where the participants did not have visible injuries, although those injuries could appear later.

¶ 34      Chicago police detective John Murray testified that on September 27, 2014, he went to the apartment building, where he noticed a trail of blood spatters on the stairs. In the apartment, Murray saw two knives "pushed underneath a counter" in the kitchen between the stove and the refrigerator, and a machete on a bed. He also described "for lack of a better term a display in which knives were hung up [on a wall] like a shrine." No "noticeable blood" was on the knives found in the kitchen. Murray identified photographs of the scene and the weapons, which are in the record on appeal and have been viewed by this court.

¶ 35      On cross-examination, Murray stated that A.C. did not appear to be visibly injured. Murray spoke with A.C. later that day, and she did not tell him that defendant had "continuously" beaten her "for two hours," stabbed her in the throat, threw her to the floor, kicked and beat her, took her phone, or that he told her that he killed her friend.

¶ 36      On redirect examination, Murray testified that A.C. stated that she and defendant fought "both physically and verbal[ly]" all day.

¶ 37      Chicago police detective Carol Maresso interviewed A.C. at the police station on September 27, 2014, in the early evening. A.C. was "very upset, *** crying, *** talking very

quickly, hyperventilating, [and] moving her arms around." Maresso noticed "some redness and swelling" to A.C.'s face, and a slight "bump" on the top of her head below her hair line. The next day, A.C. gave an electronically recorded statement, during which time Maresso saw bruising around one of her eyes, and the "bump" was "more significant." During the interview, A.C. told Maresso that defendant hit her eye, face, and gave her the "knot" on her head. A.C. also told Maresso that defendant choked her and "put an ice pick to her neck," and someone in the apartment took her phone from her. A.C. also told Maresso that defendant yelled "I'm going to let him bleed out, I'm going to let him bleed out, your boy dead [*sic*]."

¶ 38      On cross-examination, Maresso stated that no injuries were noted on the reports she wrote after the interview, and she did not write that A.C. told her that she had been "stabbed" with an ice pick, choked by defendant, beaten for two hours continuously, or had her phone taken from her. Maresso did not arrange for an evidence technician to take photographs of the injuries nor take photographs herself. A.C. also told Maresso that she had been in a physical altercation with defendant's mother, and did not specify whether her injuries were from this altercation.

¶ 39      On redirect examination, Maresso testified that her report noted that A.C. told her that she and defendant "had been physically fighting all day."

¶ 40      Defendant testified that in the morning of September 27, he argued with A.C. after she told him that she wanted to leave with the children for her aunt's house in Wisconsin. This argument continued "throughout the day." Defendant did not want A.C. to take the children because "there was a child predator there," and discussed his concerns with A.C., who had already decided to leave with the children. Neither defendant nor A.C. were physically violent with one another. In the early afternoon, defendant left the apartment because his mother asked him to go to the store

for her. When defendant left, he brought a small, curved knife with him for protection. Defendant denied taking A.C.'s cell phone from her.

¶ 41 When defendant returned, the argument with A.C. had "died down" into a discussion about whether A.C. still wanted to move to Wisconsin with the children. Defendant denied acting violently toward her. Because A.C. did not have a car, defendant assumed that Alexander would drive her, since he was her "primary source of transportation."

¶ 42 Defendant opened the door to the apartment to assist A.C. in moving her bags downstairs, and saw Carr and Noel standing in the doorway. Noel "instantly struck" defendant's face. Defendant backed up, and Carr and Noel "bum-rushed [him]," so defendant crouched. Defendant guessed that he was struck by Carr and Noel "20, 25-ish" times. Defendant was afraid for himself and the other people in the apartment. Neither Carr nor Noel stopped and defendant was unable to fend them off with his hands, so he removed his knife from its sheath and "just started to swing it *** at every angle."

¶ 43 Defendant did not know whether the knife cut anyone, and did not intend to hurt anyone. Defendant saw his brother "grab" Noel, who was still standing, and "toss him to the side." Carr grabbed defendant's knife and they struggled over it for "[m]aybe two minutes," but Carr was not successful in taking the knife from defendant's hand. Carr only stopped because defendant's brother intervened with the machete. Defendant learned that Noel had been stabbed after his brother's girlfriend told him, and "told" Carr and A.C. that Noel was upstairs and bleeding, so may need help. Defendant denied taunting them with that information.

¶ 44 On cross-examination, defendant stated that A.C. "could" leave but he did not want his children to leave, but "at some point" agreed. Defendant heard A.C. call family members for a ride, but did not hear her ask them to call police. Defendant did not recall whether he knew that

Carr would be coming to retrieve A.C.; the State confronted him with prior testimony where he testified that he knew that Alexander was driving Carr to the apartment and was expecting Carr. The State attempted to clarify that defendant "knew" that Carr would be coming, and defendant repeatedly responded "[i]f that's what the record reflects, yes."

¶ 45 A.C. never informed defendant that he would be harmed when the men came to the apartment, and defendant stated that the knife was still on his person because he had only recently returned to the apartment. Defendant did not want A.C. to take the children but denied that he armed himself to stop the children from being taken.

¶ 46 After being attacked when opening the door, defendant denied "plung[ing]" the knife forward, and stated that he was "swinging it" around. When questioned about whether a "swing" could cause the injuries to Noel, including a wound that penetrated the layers of the chest to the heart, defendant repeatedly stated "[i]f that's what the medical report reflects, then, yes."

¶ 47 Defendant denied also having the "ice pick," and stated that the knife entered as an exhibit was not an ice pick. The State asked defendant if he stabbed Carr in the back with the other "knife," and defendant responded, "I believe it was an ice pick according to the statements that [were] given to the police, not a knife, an ice pick." The State told him that [i]nstead of relying on a statement, why don't you tell us what happened. What did you use to stab [Carr] in the back?" Defendant responded, "I believe I just answered." He then agreed with the State that he had the "ice pick" in addition to the curved knife, but did not recall if he took both knives to the store. After the attack, defendant and his brother had no injuries, and he did not "see" his mother to determine if she had any. The State also confronted defendant with testimony from a prior proceeding where he testified that he did not move the knives to the kitchen and did not know who did. In response to the State's questions about the knives, defendant repeatedly stated "[i]f that's what the record reflects, yes."

¶ 48 The State informed defendant that he had initially denied saying anything through the window when he gave his statement to police. Defendant stated that he "could've been confused." Defendant did not believe that anyone attempted to assist Noel or call the police, and agreed with the State's assertion that he left Noel "dying" in the room. Defendant could not find his cell phone to call the police because everything was "chaotic," but agreed with the State's assertion that he "removed" the knives although he denied that he "hid" them.

¶ 49 On redirect examination, defendant testified that he did not remember putting the knives in the kitchen but knew that his children were still in the apartment, so removed them to be "safer." He directed the officers to the knives after they arrived.

¶ 50 Officer Ahmad testified that he spoke with A.C. at the scene and could not recall whether A.C. was injured, but that his incident report states he saw no visible injury. A.C. did not tell him that she had been beaten "continuously for two hours" or that her phone had been taken from her. Ahmad was also an arresting officer, and after he entered the apartment, had conversations which directed him to weapons. Defendant was cooperative during the investigation and his arrest.

¶ 51 In rebuttal, the State introduced a stipulation that in February 2018, defendant testified in a prior proceeding that he expected Carr.

¶ 52 The State also recalled Detective Murray, who testified that he did not see injuries on any members of defendant's family; the only two individuals who were injured were Noel and Carr.

¶ 53 During the jury instruction conference, defense counsel did not present a limiting instruction regarding the other-crimes evidence nor did the court give the jury a limiting instruction regarding this evidence at any point during the trial.

¶ 54 In closing, defense counsel contended that defendant defended himself from Noel and Carr who came into his home violently, and suggested that A.C. lied about defendant beating her and

"created the situation" to leave the apartment. Multiple times during closing argument, defense counsel contended that A.C. was not credible and a "liar." Counsel argued that Noel and Carr went to "deal with" defendant, and the injuries to the back of Noel's thighs were consistent with defendant's version of events.

¶ 55    The jury found defendant guilty of first-degree murder and aggravated battery.

¶ 56    Defense counsel filed a motion and amended motion for a new trial, arguing, *inter alia*, that the State failed to prove his guilt beyond a reasonable doubt. Defense counsel also contended that the court erred in granting the State's motions *in limine*, including the motion seeking introduction of the other-crimes evidence.

¶ 57    After a hearing, the court denied the motion, finding that the jury determined the factual issues, including the credibility of the witnesses, and it did not err in its rulings regarding the pretrial motions.

¶ 58    The matter proceeded to a sentencing hearing where the court sentenced defendant to concurrent terms of 35 years' and 5 years' imprisonment for first degree murder and aggravated battery. The court denied defendant's first motion to reconsider sentence. After defense counsel filed another motion to reconsider defendant's sentence, the court resentenced defendant to concurrent terms of 31 years' and 5 years for first degree murder and aggravated battery.

¶ 59                                II. ANALYSIS

¶ 60    On appeal, defendant first argues that the court erred by allowing the State to present "extensive evidence" that he had abused A.C. before the incident, which it used as proof of defendant's propensity for violence. Defendant contends that this evidence resulted in a "mini trial" and was substantially more prejudicial than probative of guilt.

¶ 61                                         A. Evidence of Other Crimes

¶ 62          "The term 'other-crimes evidence' encompasses misconduct and criminal acts that occurred before or after the alleged charged conduct, including acts of misconduct for which the defendant was not charged or convicted." *People v. Adams*, 2023 IL App (2d) 220061, ¶ 67. Evidence of other crimes may not be introduced to show a defendant's bad character. *People v. Ware*, 2019 IL App (1st) 160989, ¶ 40; Ill. R. Evid. 404(b) (eff. Jan. 1, 2011). However, such evidence is admissible if relevant for any purpose other than to show the defendant's propensity to commit crimes. *People v. Wilson*, 214 Ill. 2d 127, 135 (2005). Permissible purposes include motive, intent, identity, and accident or absence of mistake. *People v. Dabbs*, 239 Ill. 2d 277, 283 (2010). Evidence of other crimes also may be admitted where the other crimes are "intrinsic" to the charged offense, "intertwined" with it, or if the other crime is "part of the 'continuing narrative' of the charged crime.". *People v. Pikes*, 2013 IL 115171, ¶¶ 19-20.

¶ 63          "Even if offered for a permissible purpose, such evidence will not be admitted if its prejudicial effect substantially outweighs its probative value." *Dabbs*, 239 Ill. 2d. at 284. The admissibility of other crimes evidence is within the trial court's sound discretion, and its decision will not be disturbed absent a clear abuse of discretion. *Wilson*, 214 Ill. 2d at 136. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." (Internal quotation marks omitted.) *People v. Sloan*, 2024 IL 129676, ¶ 15.

¶ 64          Here, the trial court did not abuse its discretion in allowing the State to present the other crimes evidence. The State offered evidence that defendant had beaten A.C. and held an ice pick to her throat because she wanted to take their children to Wisconsin. The alleged beating occurred the same day that defendant stabbed Noel and Carr, who arrived to retrieve A.C. and the children.

This evidence is relevant to establish defendant's motive to stab Noel and Carr, especially where defense counsel relied upon the affirmative defense of self-defense and defendant testified that he stabbed Noel and Carr in response to their unprovoked attack against him. See *People v. Boyd*, 366 Ill. App. 3d 84, 92 (2006) ("[M]otive is the inducement to do some act.").

¶ 65    The evidence is also relevant as to the course of conduct or as part of the "continuing narrative" of the charged offenses, because the evidence concerned circumstances "attending the entire transaction" rather than "separate, distinct and disconnected crimes." *People v. Adkins*, 239 Ill. 2d 1, 32 (2010). We first note that "[s]ome courts have recognized a distinction between traditional other-crimes evidence (extrinsic) and evidence of an uncharged crime that is related to the charged offense (intrinsic)," while other courts "have treated 'intrinsic' evidence as an exception to the general exclusion of other-crimes evidence." *Pikes*, 2013 IL 115171, ¶ 19. As our result is the same under either theory, we need not resolve whether "intrinsic" acts constitute "other crimes" evidence.

¶ 66    A.C.'s testimony established that defendant beat her and placed a knife against her neck because she wished to take her children to her aunt's house in Wisconsin. A short time later, Noel and Carr arrived to help A.C. and the children leave the apartment. Defendant then wielded a curved knife, and stabbed Noel in the chest. Carr grabbed the blade of the knife with his hand, causing permanent injury, and struggled with defendant, who then stabbed him with the same ice pick that he held earlier against A.C.'s throat. A.C.'s testimony is therefore relevant to explain the circumstances surrounding defendant's actions against Noel and Carr. Additionally, the events occurred the same afternoon, in the same apartment, and arose from the same dispute over A.C. leaving with the children. That close connection increases the evidence's relevance. See *People v.*

*Ramsay*, 2017 IL App (1st) 160977, ¶ 32 ("As factual similarities increase, so does the relevance, or probative value, of the other-crime evidence.").

¶ 67     We also reject defendant's contention that the other crimes evidence was substantially more prejudicial than probative of guilt and resulted in a "mini-trial." The testimony was limited to what was necessary to explain why help was summoned and what immediately led to the stabbings. The State did not introduce evidence that would have turned the case into a trial over uncharged domestic battery.

¶ 68     As noted, other-crimes evidence "will not be admitted if its prejudicial effect *substantially* outweighs its probative value." (emphasis added) *Dabbs*, 239 Ill. 2d. at 284. When weighing prejudice, a court should consider whether this evidence becomes the "focus" of the trial. *People v. Perez*, 2012 IL App (2d) 100865, ¶ 47. Prejudice means "an undue tendency to suggest decision on an improper basis, commonly an emotional one, such as sympathy, hatred, contempt, or horror." *People v. Barnes*, 2013 IL App (1st) 112873, ¶ 52. A mini-trial may be avoided "by carefully limiting the details of the other crime to what is necessary to illuminate the issue for which the other crime was introduced." (Internal quotation marks omitted.) *Boyd*, 366 Ill. App. 3d at 94.

¶ 69     Here, A.C.'s testimony that defendant beat her was sufficiently tailored to establish that defendant stabbed Noel and Carr because he did not want A.C. to take the children, not in self-defense. Her testimony was not overly gruesome or lengthy, and the State did not make the other-crimes evidence the focus. See *Perez*, 2012 IL App (2d) 100865, ¶ 47. The State's evidence about A.C.'s injuries, for example, was presented to show A.C.'s state of mind and explain why her injuries were not initially visible after the incident, not to portray defendant as unusually cruel or a "bad person" deserving of punishment.

¶ 70   In sum, the record does not support defendant's contention that the jury convicted defendant due to an improper basis related to the other-crimes evidence. See *Barnes*, 2013 IL App (1st) 112873, ¶ 52. Given its close connection to the events, this evidence did not pose a substantial risk that the jury would convict defendant because it viewed him as a violent person. Accordingly, the evidence was not arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. See *Sloan*, 2024 IL 129676, ¶ 15.

¶ 71                    B. Ineffective Assistance of Counsel

¶ 72   Alternatively, defendant contends that defendant's trial counsel was ineffective for failing to request a limiting instruction regarding the admission of the other-crimes evidence. See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14). Although the court noted before trial that a limiting instruction would be appropriate, it remained defense counsel's responsibility to request such an instruction and counsel did not do so. See *People v. Richardson*, 2011 IL App (4th) 100358, ¶ 11 (citing *People v. Springs*, 51 Ill. 2d 418, 425 (1972)) ("Absent plain error, a court generally has no duty to introduce an instruction not requested by counsel."). Defendant argues that because counsel did not request IPI Criminal No. 3.14, the jury likely considered the evidence in relation to defendant's propensity to commit crimes and, thus, was overpersuaded on his guilt.

¶ 73   We review claims of ineffective assistance of counsel using the two-part test in *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Manning*, 241 Ill. 2d 319, 326 (2011). To establish a claim of ineffective assistance, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. To establish prejudice, the defendant must show a reasonable probability that, but for the errors, the result of the proceeding

would be different; namely, a "probability sufficient to undermine confidence in the outcome." *Id*. A defendant must satisfy both prongs to raise a successful claim. *Id*. Our review is *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 74    "It is well settled in Illinois that counsel's choice of jury instructions, and the decision to rely on one theory of defense to the exclusion of others, is a matter of trial strategy." *People v. Sims*, 374 Ill. App. 3d 231, 267 (2007). A defendant is entitled to competent rather than perfect representation, and mistakes in strategy or tactics do not, of themselves, render counsel's representation incompetent. *People v. Johnson*, 372 Ill. App. 3d 772, 777-78 (2007). Due to the "variety of factors" affecting trial strategy, "such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002). Counsel's decision regarding the tendering of jury instructions can support a claim of ineffective assistance "only if that choice is objectively unreasonable." *Sims*, 374 Ill. App. 3d at 267.

¶ 75    IPI Criminal No. 3.14 states:

> "[1] Evidence has been received that the defendant[s] [(has) (have)] been involved in [(an offense) (offenses) (conduct)] other than [(that) (those)] charged in the [(indictment) (information) (complaint)].
> [2] This evidence has been received on the issue[s] of the [(defendant's) (defendants')] [(identification) (presence) (intent) (motive) (design) (knowledge) (_____)] and may be considered by you only for that limited purpose.
> [3] It is for you to determine [whether the defendant[s] [(was) (were)] involved in [(that) (those)] [(offense) (offenses) (conduct)] and, if so] what weight should be given to this evidence on the issue[s] of _____." IPI Criminal No. 3.14.

¶ 76    Defendant contends that no reasonable strategy existed for counsel's failure to request IPI Criminal No. 3.14. We disagree. One of defense counsel's strategies was to attack A.C.'s credibility, highlighting inconsistencies in her testimony and the unbelievability of her description

of the fight between her and defendant. It is possible that defense counsel believed that requesting IPI Criminal No. 3.14 would draw attention to her statements and imply that the events occurred the way she testified. See *People v. Peel*, 2018 IL App (4th) 160100, ¶ 52 ("The decision to not request a limiting instruction may have been trial strategy in order to avoid drawing undue attention to the other-crimes evidence."). We do not find that this strategic decision was objectively unreasonable. See *Sims*, 374 Ill. App. 3d at 267.

¶ 77        Nevertheless, even if trial counsel's failure to request IPI Criminal No. 3.14 was not sound trial strategy, defendant cannot show that this prejudiced him. The trial evidence established that Noel and Carr arrived at the apartment to take A.C. and her children to Wisconsin, an act to which defendant admitted he initially opposed. Defendant testified that he acted in self-defense because Noel and Carr attacked him, and accidentally stabbed Noel while waving the knife. Dr. Arunkumar, however, testified that the stab wound required about 11 pounds of pressure, equivalent to "the force required to stab or penetrate a melon." Additionally, defendant was impeached several times on prior inconsistent statements, including whether he yelled anything out the window, and his cross-examination answers were often evasive. A.C., Carr, and Alexander all testified to a roughly similar sequence of events. On this record, defendant has not shown a reasonable probability that a limiting instruction would have affected the outcome of the trial. See *Veach*, 2017 IL 120649, ¶ 30 (Where defendant cannot establish prejudice, his ineffective assistance of counsel claim fails).

¶ 78                                III. CONCLUSION

¶ 79        For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 80        Affirmed.